## THE ISLE OF MULL.

**ISLES STEAMSHIPPING CO., Limited, v. GANS STEAMSHIP LINE et al.**

(Circuit Court of Appeals, Fourth Circuit. November 1, 1921.)

No. 1868.

1. **International law ⬅10—Courts cannot question requisition of foreign vessel by its government in foreign port.**

The sanction of a foreign government, evidenced by its use of a vessel of its nationality requisitioned in a foreign port, is conclusive in the courts of this country as to the legality of the notice of requisition and the right of the government to take over the vessel.

2. **Admiralty ⬅12—Has jurisdiction to adjust equities between owner and charterer of requisitioned vessel.**

A court of admiralty has jurisdiction to determine whether the charterer of a foreign vessel, which was requisitioned by its own government during the term of the charter, has an equitable right against the owner to the portion of the amount paid by the government for the use of the vessel which exceeded the amount due under the charter, on the theory that the owner had been unjustly enriched to that extent.

3. **Shipping ⬅51—Owner not liable for surplus hire under requisition which frustrates charter.**

If the charter of a vessel is frustrated by the requisition of the vessel by its government during the term of the charter, the charterer is not entitled under the British law to recover from the owner the difference between the amount paid the owner by the government for the use of the vessel and the charter price, any more than the charterer would be liable to pay the owner the difference, if the payments under the charter exceeded those from the government.

4. **Shipping ⬅51—Government requisition, probably extending beyond term, frustrates charter.**

The requisition of a chartered vessel by its government frustrates the charter, if the requisition is for a definite period extending beyond the term of the charter, or if it is indefinite, but the circumstances indicate it will probably extend beyond the term of the charter, though a requisition for a period less than the term of the charter merely suspends the charter during the period of the requisition.

5. **Shipping ⬅51—Requisition of vessel by British government in 1915 held to frustrate charter expiring in 1918.**

Where a British vessel, under charter to an American corporation which would expire in 1918, was requisitioned by the British government in 1915, at a time when it was obvious the war would continue until the military exhaustion of one side, and that Great Britain would need to mobilize her entire shipping to meet the losses occasioned by submarines, the circumstances indicated that the use of the vessel would probably continue, as it did, until after the term of the charter had expired, so that the charter was frustrated, and the charterer cannot recover from the owner the amount received from the British government in excess of the charter hire.

Appeal from the District Court of the United States for the District of Maryland, at Baltimore; John C. Rose, Judge.

Libel in admiralty by the Gans Steamship Line against the Isles Steamshipping Company, Limited, as owner of the steamer Isle of

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Mull. Decree for libelant (257 Fed. 798), and respondent appeals. Reversed and remanded, with instructions to dismiss the libel.

John M. Woolsey, of New York City (Stuart S. Janney, of Baltimore, Md., on the brief), for appellant.

John W. Griffin, of New York City (Wharton Poor and Haight, Sandford, Smith & Griffin, all of New York City, on the brief), for appellees.

Before KNAPP and WOODS, Circuit Judges, and WATKINS, District Judge.

WOODS, Circuit Judge. On May 19, 1913, Gans Steamship Line, a New York corporation, made a charter contract in England with Isles Steamshipping Company, Limited, a British corporation, owner of the steamship Belle of Ireland, afterwards called Isle of Mull, for the hire of the vessel for "about five years" from time of delivery, at the price of £1,370. a month. The charter contained the usual restraint of princes clause. The ship began service under the charter January 7, 1914. On June 10, 1915, while the vessel was on a voyage to Lisbon, notice from Mathwin & Co., purporting to be issued on behalf of the British Admiralty, was given to the owner that the vessel was requisitioned for government service. Under this notice the British Admiralty assumed control of the vessel on June 12, 1915, at Bilbao, Spain, and retained it beyond the period of the charter, The price fixed by the government was £2,361. 15s. a month, £991. 15s. more than the charter hire.

The charterer insisted from the first, in correspondence with the owner, that its contract remained in force, and tendered the monthly payments therein stipulated for the entire period. In its libel, filed July 25, 1915, the charterer alleged breach of the charter contract by the owner, and claimed as damages the difference between the market value of the use of the ship for the unexpired time, set down as £5,110. a month, and the price it had agreed to pay. The owner denied breach of the contract, and set up as a defense complete frustration of the contract by the requisition.

The District Court held that the charter had not been frustrated, and that the charterer was entitled to recover from the owner the difference between the price fixed by the charter and the greater price paid the owner by the British government for the use of the vessel. The question made by the appeal of the owner is whether the charter was frustrated and all rights and obligations of the owner and the charterer terminated by the requisition.

[1] We need not pause to discuss the legal authority of the source of the notice of requisition, or the right of the British Admiralty to take over a British vessel in a foreign port. The sanction of the British government, evidenced by its use of the ship for the entire period of the charter, is conclusive in the courts of this country. Texas Co. v. Hogarth Shipping Corp., 256 U. S. 619, 41 Sup. Ct. 612, 65 L. Ed. ——, filed June 6, 1921.

[2] The contention is made, on the authority of The Claveresk (C. C. A.) 264 Fed. 276, that the court of admiralty has no jurisdiction.

This cannot be sound, unless courts of admiralty are to admit, in analogy to the admission once unfortunately made by the common-law courts, that they have no form of action expansive enough to meet a new condition arising out of a strictly maritime contract. Nothing less than the plainest controlling authority would justify such an admission. The reasons would, indeed, be much stronger for a court of equity than for a court of admiralty to refuse jurisdiction of the case.

The true view of the libel on the question of jurisdiction, as it seems to us, is that the charterer sues for breach of the owner's contract to give it the use of the vessel for the time specified. The owner answers, admitting that it did not keep the vessel in the service of the charterer, and setting up the affirmative defense that performance of its contract was made impossible by government interference. The issue as thus presented to the court then is: Does the defense of requisition altogether defeat the libel? or is the defense allowable in justice and good conscience only on condition and to the extent that the owner shall not appropriate to itself benefits derived from the use of the vessel by the government for the time that, as between itself and the charterer, the latter was entitled to them—that the owner shall not be enriched from the government's use of the vessel at the expense of the charterer?

True, this is an inquiry into the equity of the matter, in the sense of inquiry into the justice of the controversy. But it is in no sense an inquiry belonging exclusively to a court of equity. Even common-law courts constantly decide causes on grounds of fraud, mistake, unjust enrichment, and other grounds sometimes thought of as peculiar to courts of equity. Courts of admiralty have often decided cases on the equities which arise incidentally in the exercise of their jurisdiction. The Port Adelaide (D. C.) 59 Fed. 174; The Emma B. (D. C.) 140 Fed. 771; The Seguranca, 250 Fed. 19, 162 C. C. A. 191.

The main question on the merits is difficult. The strong reasons in favor of the charterer's claim may be thus stated: The charter confers upon it the right to the use of the vessel for the specified period. This right, although not a demise, is a property right. There is the strongest presumption against the intention of the British government to appropriate this property of the charterer without compensation. Yet the government, in the stress of a war involving its highest interest, if not its existence, cannot take time to adjust the rights of the charterer and the owner. The government needs the vessel, and takes it from the owner, because the owner is in actual possession by its master and crew, and pays the owner with whom it deals a lump sum, leaving it to meet other claimants. But it pays the owner for the use, not for the vessel itself. Therefore, since the charterer had legal right to the use of the vessel, the owner, after paying itself the amount due under the contract and compensation for any losses sustained, holds the remainder for the charterer. To allow the owner to retain the excess paid by the government would be to allow it to avail itself of the act of the government, a third party, to enrich itself at the expense of the charterer by the practical appropriation of the charterer's property right.

The opposing argument that, if this be true, by parity of reasoning the charterer should pay the contract hire, when the government pays nothing or less than the contract price, is not convincing. When the government breaks into the charter by seizing the vessel, the charterer is deprived of its use, and if the government pays nothing, neither party has any claim against the other, because neither is enriched at the expense of the other. If the government pays the same as the contract price, the owner gets no more than it is entitled to under the contract, and, although the charterer may lose commitments for freight, the owner owes it nothing. If the government pays less than the contract price, both the owner and the charterer lose, the owner a part of its hire and the charterer the use of the vessel; but the charterer has not been enriched at the expense of the owner, and therefore the owner has no claim against it. It has nothing in its pocket that ought to be in the pocket of the owner.

The restraint of princes clause is intended for the protection of the party whose ability to carry out his contract is destroyed or impaired by the enumerated causes. The other party cannot avail himself of it to escape his obligations. Detention of the ship in quarantine or requisition for public service for the entire period of the charter does not entitle the owner to set up the claim that the charter is annulled, if the charterer chooses to pay the hire. It would be turning the restraint of princes clause backward to allow the party claiming the benefit of it to enrich himself at the expense of the other.

It is true that regard for the interests of the parties, as for the public interests, requires that both parties should know at the time of the requisition how their rights have been affected by it, and hence those rights and obligations must not be left in uncertainty to be determined by future events. But in this case that consideration has no application for the reason that, at the moment of requisition and since, the charterer has assured the owner of all its rights under the original contract, by notice that it will remain bound, and by tender every month of the charter hire.

Finally, even if it be admitted that the contract has been frustrated and destroyed, the courts should not award all the benefit of the salvage from the wreck to the party who happens to be in possession of it. In such a situation, neither party being at fault, the reason seems to be cogent for the courts to take cognizance of anything of value, wherever found, which arose from the destruction of the contract, and adjust the equities of the parties therein, guided by their respective contract rights in the subject of the contract.

The argument in favor of the owner's rights to the entire compensation for the use of the vessel paid by the British government is this: The requisition of the ship by the government for an indefinite period completely frustrated the contract and put an end to all rights of both parties under it. This is true, first, because under the general law the contract ceases to operate when the particular thing contracted for ceases to be available for the purpose contemplated; and, second, because under the restraint of princes clause the requisition of the ship relieved the owner of all obligation to the charterer for the service of

the ship, and as a consequence from all obligation to account for the hire of it. Lord Haldane's statement, in Tamplin Steamship Co. v. Anglo-Mexican Petroleum Products Co., [1916] 2 A. C. 406, of the principle contended for, has been generally accepted by the British courts:

"When people enter into a contract which is dependent for the possibility of its performance on the continued availability of a specific thing, and that availability comes to an end by reason of circumstances beyond the control of the parties, the contract is prima facie regarded as dissolved. The contingency which has arisen is treated, in the absence of a contrary intention made plain, as being one about which no bargain at all was made. The principle applies equally, whether performance of the contract has not commenced or has in part taken place. There may be included in the terms of the contract itself a stipulation which provides for the merely partial or temporary suspension of certain of its obligations, should some event (such, for instance, as in the charter party under consideration, restraint of princes) so happen as to impede performance. In that case the question arises whether the event which has actually made the specific thing no longer available for performance is such that it can be regarded as being of a nature sufficiently limited to fall within the suspensory stipulation, and to admit of the contract being deemed to have provided for it and to have been intended to continue for other purposes. Although the words of the stipulation may be such that the mere letter would describe what has occurred, the occurrence itself may yet be of a character and extent so sweeping that the foundation of what the parties are deemed to have had in contemplation has disappeared, and the contract itself has vanished with that foundation."

Therefore, the owner contends, if the government pays more than the charter hire, it is the owner's gain; if less, it is the owner's loss. If this were not so, the charterer would be bound to pay the full charter hire, when the government paid less, or even nothing, for the use of the ship. This rule is logical and simple. It fixes the rights of the parties at the moment of requisition, freed from all doubts and perplexities as to their rights and obligations, to the end that they may immediately readjust their affairs. When this simple rule is once established and understood, no real hardship will grow out of it, since all charter parties will be made in contemplation of it. The hardship of applying it to some cases in the meantime cannot be denied, but it will be found in the practical administration of justice better to allow even this hardship than for courts to enter upon the confusing, if not impossible, task of adjusting the equities between the owner and the charterer. The vessel may be used, as in this case, in a service not contemplated by the charter; it may be altered to meet the needs of the government service; it may be injured in that service; the charterer's contracts may be so broken into by the requisition that he cannot use the vessel at the date of its release. The effort to measure these and other factors entering into the adjustment of the equities would involve the parties in intricate and costly litigation and delay.

[3, 4] The difficulty of deciding between these two lines of reasoning is reflected in the many elaborate discussions of the British courts. Reconcilement of the numerous cases is hardly possible. The result of the consideration of the British courts, as we understand, is this: If the contract for hire is completely frustrated by the requisition, the rights and obligations of both parties are ended. In that case, if the government pays compensation larger than the charter hire, it is the

owner's good fortune; if smaller compensation, or no compensation, it is the owner's misfortune. Whether the requisition frustrates the contract is a question depending on the extent of the interference. A requisition for a definite time, materially less than the unexpired period of the charter contract, works a mere interruption, and not a frustration; a requisition for a definite time extending beyond the unexpired period of the charter contract works a complete frustration.

This reasoning afforded no certain guide when the requisition was for an indefinite period, as it generally was. But the British courts applied the principle in this way: If consideration of all the circumstances existing at the time of the requisition led to the conclusion that it would probably continue beyond the charter period, then the charter is frustrated, the charterer is released, and the owner takes the compensation paid by the government—whether more or less than the charter hire. If, on the other hand, the circumstances indicated probable release of the vessel for a substantial time before the expiration of the charter period, the charter contract is held still in force; the charterer is liable to pay the charter hire for the period, and is entitled to any net compensation received by the owner beyond the charter hire. In the last condition, however, the net additional compensation is ascertained by taking into account any substantial loss or disadvantage to the owner, due to the requisition of the vessel. On the issue of the probable return of the vessel before the expiration of the charter period, the burden of proof is on the party asserting the frustration of the contract. In weighing this issue of probability the courts take into consideration, not only the conditions existing at the time of the requisition, but the real duration of the requisition. We have cited in the note the more important of the British cases dealing with the subject.[1]

In this country the same test of the certainty or probability of the requisition extending beyond the period of the charter was applied by the Circuit Court of Appeals of the Second Circuit in The Claveresk, 264 Fed. 276. The charter was for "about five years," ending April, 1918. In January, 1917, the ship was requisitioned, and on February 10, 1917, commenced service under the British government. While

[1] Tamplin S. S. Co. v. Anglo-Mexican P. P. Co., [1916] 2 A. C. 397, 85 L. J. K. B. N. S. 1389, 115 L. T. N. S. 315, 32 Times L. R. 677, 8 British Rul. Cas. 550; Countess of Warwick S. S. Co. v. Le Nickel Société Anonyme, [1918] 1 K. B. 372, 87 L. J. K. B. N. S. 309, 23 Com. Cas. 231, 118 L. T. N. S. 196, 34 T. L. R. 27, 8 B. R. C. 546; Metropolitan Water Board v. Dick, Kerr & Co., [1918] A. C. 119, 87 L. J. K. B. N. S. 370, 23 Com. Cas. 148, 34 Times L. R. 113, 16 L. G. R. 1, 117 L. T. N. S. 766; [1917] W. N. 352, 82 J. P. 61, 8 B. R. C. 483; Bank Line, Ltd., v. Arthur Capel & Co., 35 T. L. R. 150, [1918] House of Lords; Anglo-Northern Trading Co. v. Emlyn, Jones & Williams, [1917] 2 K. B. 78, [1918] 1 K. B. 372; Heilgers v. Cambrian Steam Navigation Co., 33 T. L. R. 348, 34 T. L. R. 372; Chinese Mining & Engineering Co. v. Sale & Co., [1917] 2 K. B. 599; Modern Transport Co. v. Duneric S. S. Co., [1917] 1 K. B. 370, 115 L. T. N. S. 535, 86 L. J. K. B. N. S. 164, 33 Times L. R. 55, 61 Sol. Jo. 71, 22 Com. Cas. affirming [1916] 1 K. B. 726, 8 B. R. C. 557; Dominion Coal Co. v. British & Chilean S. S. Co., Lloyds List Weekly Summary, April 25, 1919; Dominion Coal Co. v. Roberts, 36 T. L. R. 837. The numerous English cases are discussed in the opinion and the note, 8 British Ruling Cases, 483, 507.

holding the contract frustrated by the requisition, the court refused to consider whether the charterer was entitled to an accounting for the additional compensation paid by the government under the requisition, because the libel was for damages.

In Allanwilde Transportation Co. v. Vacuum Oil Co., 248 U. S. 377, 39 Sup. Ct. 147, 63 L. Ed. 312, 3 A. L. R. 15, the contract was for the carriage of a single specific cargo from New York to Rochefort, France. The voyage at the time contemplated was prevented by an indefinite embargo imposed because of the submarine menace. In holding the contract frustrated the court said:

"It is urged, however, that there is no provision in the contract (charter party and bill of lading) of the Oil Company excepting 'restraint of princes, rulers, and peoples,' and that, therefore, the carrier was not relieved from its obligation by the refusal of clearance to sailing vessels. And it is further urged that such embargo was at most but a temporary impediment and the cargo should have been retained until the impediment was removed or transported in a vessel not subject to it. We cannot concur in either contention. *The duration was of indefinite extent. Necessarily, the embargo would be continued as long as the cause of its imposition—that is, the submarine menace—and that, as far as then could be inferred, would be the duration of the war, of which there could be no estimate or reliable speculation.* The condition was, therefore, so far permanent as naturally and justifiably to determine business judgment and action depending upon it. The Kronprinzessin Cecilie (North German Lloyd v. Guaranty Trust Co.) 244 U. S. 12, 61 L. Ed. 960, 37 Sup. Ct. Rep. 490."

The language we have italicized seems to imply that in the view of the Supreme Court any inquiry as to the duration of the great war, or the continuance of an embargo or requisition growing out of it, would be too speculative and illusory to be made the basis of judicial action, and therefore that an indefinite embargo or requisition should be treated as in itself a frustration of the charter party.

In Texas Co. v. Hogarth Shipping Corporation (June 6, 1921), the ship was chartered for a voyage from a port in Texas to a port in South America. The restraint of princes clause was absent. On April 10, 1915, while being provisioned in British waters for the intended voyage, the ship was requisitioned by the British government and retained until October following, after the expiration of the time within which the voyage would have been made. The court holds the charter frustrated on this reasoning:

"Here the ship, although still in existence and entirely seaworthy, was rendered unavailable for the performance of the charter party by the requisition. By that supervening act she was impressed into the war service of the British government for a period likely to extend—and which, as it turned out, did extend—long beyond the time for the charter voyage. In other words, compliance with the charter party was made impossible by an act of state, the charterer was prevented from having the service of the ship and the owner from earning the stipulated freight. The event apparently was not anticipated and there was no provision casting the risk on either party. Both assumed that the ship would remain available and that was the basis of their mutual engagements. These, we think, must be regarded as entered into on an implied condition that, if before the time for the voyage the ship was rendered unavailable by such a supervening act as the requisition, the contract should be at an end and the parties absolved from liability under it."

It is true in both these cases the charter was for a single voyage; and in the latter case the enterprise contracted for had not been entered upon. But an executory contract is no less binding than a contract partially performed as to the rights conferred and the obligations assumed. The only substantial distinction between a voyage charter and a charter for years, on the issue of frustration, is that in the former the embargo or requisition in most cases is certain to continue beyond the expected termination of the voyage, while in the latter there is difficulty in ascertaining whether the requisition would probably extend beyond the period of the charter. On the other hand, in the case of a voyage charter defeated by requisition, the adjustment of the rights of the owner and charterer in excess hire paid by the government is simple, while the effort to make such adjustment in case of a time charter defeated involves the court in a maze of uncertainty.

[5] In this case the testimony is conflicting as to the facts from which the probability or improbability of the release of the vessel could be inferred. In June, 1915, the date of the requisition, the war was increasing in intensity. The peoples involved were developing military strength, endurance, and resources beyond their own most extravagant estimates. Men of knowledge and vision could form no opinion of value as to the probable duration of the war, beyond the conviction that it would come to an end only with the exhaustion of the military resources of one or both sides. The necessity was becoming more acute for Great Britain to mobilize all her sea power, including her merchant marine, to meet the increasing losses and perils from submarines. According to the testimony of witnesses for libelant, vessels were released by the Admiralty from time to time; but many more were held under requisition until the end of the war. In view of these facts, and the conflicting testimony of the witnesses, we cannot resist the conclusion that at the time of the requisition release of the vessel during the period of the charter party was improbable. This conclusion is strengthened by the reflex light on the question afforded by the fact that the ship was actually held under the requisition beyond the charter period.

Weighing the matter by established judicial tests, we think the charter party was frustrated by the requisition, and that the District Court erred in awarding to the charterer the difference between the contract hire and the compensation paid by the government to the owner.

The decree of the District Court will therefore be reversed, and the cause remanded, with instructions to dismiss the libel. The costs in this court to be paid by the appellees and the costs in the District Court to be divided equally between the parties.

Reversed.