## M. A. QUINA EXPORT CO. v. SEEBOLD.

(Circuit Court of Appeals, Fifth Circuit. February 17, 1923.)

No. 3903.

Shipping ☞51—Declaration of unrestricted submarine warfare was "extraordinary occurrence" within exception to charter.

Though a charter party containing the usual exception of "extraordinary occurrence" beyond control of either party was entered into after the outbreak of the European War, so that the parties must have contemplated the risks incident to transporting the cargo specified, which was deemed contraband by Germany, to a port in the British Isles, the subsequent declaration by Germany of unrestricted submarine ·warfare and intention to sink without warning any merchant vessel found within a zone around the British Isles, was an extraordinary occurrence which justified the owner in thereafter refusing to perform the charter.

[Ed. Note.—For other definitions, see Words and Phrases, Second Series, Extraordinary Occurrence.]

Appeal from the District Court of the United States for the Southern District of Florida; Rhydon M. Call, Judge.

Libel in admiralty by the M. A. Quina Export Company against Theodoro Seebold for breach of a charter party. From a decree dismissing the libel (280 Fed. 147), libelant appeals. Affirmed.

James F. Glen, of Tampa, Fla., and Francis B. Carter, of Pensacola, Fla. (Carter & Yonge, of Pensacola, Fla., on the brief), for appellant.

C. C. Whitaker, W. F. Himes, H. L. Coachman, and Karl E. Whitaker, all of Tampa, Fla., for appellee.

Before WALKER, BRYAN, and KING, Circuit Judges.

WALKER, Circuit Judge. This was a libel in personam claiming damages for the alleged breach of a charter party dated February 16, 1916, whereby the Maria Lorenza, a sailing vessel of·299 tons register, was chartered to the libelant, the appellant, for the carriage of a cargo of "deals and/or boards at charterer's option" from a Gulf port, to be declared by the charterer, to "any safe always afloat port in the United Kingdom, not east of Southampton, both ports included, as ordered on signing bills of lading." The charter party provided that,

should the vessel not be at the port of loading on or before June 15, 1916, the charterer would have the option of canceling the charter. Prior to January 24, 1917, Pensacola was designated as the loading port, and on that day the appellant, at the request of the shipowner, the appellee, extended the time for performance of the charter party to April 15, 1917. The breach alleged was that the appellee did not, pursuant to the charter party, cause the ship to proceed to Pensacola to load, but caused it to go to Tampa, where at the time the libel was filed in June, 1917, it was engaged in loading a cargo of lumber and automobiles for Spain on the appellee's account. The ship sailed under the flag of Uruguay, and the appellee was a citizen of Spain. The charter party contained the following:

"The act of God, restraints of princes and rulers, the king's enemies, fire, floods, frost, droughts, strikes, combinations, or any extraordinary occurrence beyond control of either party, and all and every other dangers and accidents of the seas, rivers and navigation of what nature and kind soever during the said voyage, always mutually excepted, including negligence clause as attached."

The following is the clause attached:

"The act of God, perils of the sea, fire, barratry of the master or crew, enemies, pirates, thieves, arrests and restraints of princes. rules and people. collisions, stranding and other accidents of navigation excepted, even when occasioned by negligence, default or error in judgment of the pilot, master, mariners, or other servants of the shipowners."

The answer to the libel admitted the conduct which the libel charged was a breach of the charter party, and set up as a defense that appellee was excused from performance of the charter party by the action of the German government in instituting on February 1, 1917, pursuant to its proclamation issued January 31, 1917, and thereafter carrying on, unrestricted submarine warfare, involving the sinking without warning of any vessel, belligerent or neutral, found in a described zone of the sea which included the waters surrounding the British Isles. By stipulation the parties admitted facts, including the following:

The appellee and the master of the vessel had knowledge of the above-mentioned proclamation at the time of its issuance. Immediately following that proclamation the German government began and continued until long after April 15, 1917, to execute its declared purpose set forth in that proclamation, and in so doing employed a large number of its submarines, operating in the zone described therein which surrounded the British Isles, and, without warning, sunk and destroyed vessels, including those of neutral nations, with their cargoes and crews, undertaking to pass through said zone, whereby vessels, including those of neutral nations, attempting ingress and egress to and from all British ports during said period were subjected to the danger of being torpedoed and sunk without warning. During the period between February 1, 1917, and June 30, 1917, 43 sailing vessels from ports of the West Indies and the United States destined to British ports were sunk and destroyed by German submarines in the above-mentioned zone. During the same period 55 sailing vessels from ports of the West Indies and the United States destined to British ports escaped.

The Maria Lorenza was unarmed and in no way prepared or equipped to defend herself from submarine attack.

In behalf of the appellee it was contended that nonperformance of the charter party was excused under the terms thereof which stated that restraints of princes, rulers, and people, or any extraordinary occurrence beyond control of either party, were mutually excepted, and on the further ground that, under what is called the doctrine of frustration of contracts, the charter party ceased to be binding as a result of the change of circumstances which occurred between the time it was entered into and the time set for performance. If nonperformance was excused on any one of those grounds the other grounds relied on need not be considered. If under an express provision of the shipowner's contract he was not required to incur the increased risk resulting from the inauguration and prosecution by Germany of unrestricted submarine warfare, it is unnecessary to inquire whether, on the ground that it cannot be believed that the charter party sued on would have been made if when it was made conditions had been such as they were when performance was stipulated for, such increased risk was within an implied exception to the appellee's undertaking. The Kronprinzessin Cecilie, 244 U. S. 12, 37 Sup. Ct. 490, 61 L. Ed. 960; The Styria, 186 U. S. 1, 22 Sup. Ct. 731, 46 L. Ed. 1027; Pacific Phosphate Co., Ltd., v. Empire Transportation Co., Ltd., 36 Law Times Rep. 750.

When the charter party was entered into in February, 1916, the European War was in progress, and it is to be inferred that the parties contemplated that the stipulated voyage would be made during the war. The cargo to be carried to a port of one of the belligerents was lumber, which at all times during the war was classed by Germany, an opposing belligerent, as absolute or conditional contraband. Under the rules of international law, though the cargo was subject to seizure and condemnation, the vessel was not subject to forfeiture, and it and the lives of its crew, by the prosecution of the adventure, were not exposed to loss by lawful action of a belligerent. The brief of counsel for the appellant contains references to a proclamation issued by the German government on February 16, 1915, whereby the waters surrounding Great Britain were declared to be a war zone, and notice was given that even neutral ships are exposed to danger in that zone, as in view of an alleged misuse of neutral flags and the accidents of war, it cannot always be avoided to strike even neutral ships in attacks that are directed at enemy ships, and to provisions of the German Prize Code authorizing the condemnation and, in certain contingencies, the destruction of neutral vessels carrying contraband, and to instances of the sinking of neutral vessels by German war craft before unrestricted submarine warfare was begun.

The incidents mentioned were referred to in support of the contention that before the declaration of unrestricted submarine warfare a neutral vessel undertaking such a voyage as the one stipulated for incurred a risk of being sunk by a German submarine or of being condemned by German authorities. Though such risks existed and were in contemplation of the parties when the charter party was entered into, it cannot plausibly be denied that the situation of neutral vessels engaged in such voyages as the one provided for by that instrument

was materially changed for the worse by the operations of German submarines as carried on after the issuance of the proclamation of January 31, 1917. Thereby the risks to which such vessels were exposed in the zone mentioned were substantially increased, and the lives of those on board were subjected to substantially greater risks than would have been incurred under previously existing conditions; and it cannot be denied that such action taken by Germany and its submarines was an "extraordinary occurrence beyond the control of either party."

We think it is to be inferred that the just-quoted language was intended to include such an occurrence as would have the effect of making performance of the stipulated undertaking vitally different and more hazardous than it would have been in the absence of such occurrence. It may be inferred that, in agreeing on the above-quoted part of the exception clause, the parties did not have in mind a future occurrence, not having the effect of materially changing the conditions under which the voyage would be entered upon. But it cannot reasonably be supposed that that language would have been used if the parties had intended to remain bound in the event of performance becoming materially more difficult, more uncertain, or more hazardous to property and persons engaged therein, in consequence of "any extraordinary occurrence beyond the control of either party." We are of opinion that under the quoted express exception to the shipowner's undertaking performance by him was not required under the vitally unfavorable different conditions brought about, after the charter party was entered into, by the inauguration and prosecution by Germany of unrestricted submarine warfare as above stated.

It follows that the court did not err in dismissing the libel. Its decree to that effect is affirmed.