**ISRAEL et al. v. LUCKENBACH ·S. S. CO., Inc.***

(Circuit Court of Appeals, Second Circuit. February 9, 1925.)

No. 173.

1. **Contracts ⊕⊐309(2)—Change of conditions may effect cancellation.**

Where parties enter into a contract on the assumption that some particular thing essential to its performance will continue to exist and be available for that purpose, and neither agrees to be responsible for its continued existence and availability, the contract must be regarded as subject to the implied condition that if, before the time for performance, and without the default of either party, the particular thing ceases to · exist or be available for the purpose, the contract shall be dissolved and the parties excused from performing it.

2. **Shipping ⊕⊐141(1)—Cancellation of freight contract by steamship company held justified by war conditions.**

Under a contract of affreightment made in war time, conditioned on the continuance of the steamship company's service and the sailing of its steamers, and providing that, if at any time in its judgment conditions of war made it unsafe or imprudent for its vessels to sail, it might cancel the contract, the loss of some of its vessels sunk by the enemy and the requisition of the remainder by the government, leaving it none available for the service, *held.* to justify its cancellation of the contract.

Hand, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by Leon Israel and Samuel Israel, copartners, against the Luckenbach Steamship Company, Inc. Decree for libelants, and respondent appeals.. Reversed.

For opinion below, see 286 F. 749.

Carter, Carter & Phillips, of New York . City (Peter S. Carter and Robert Phillips, both of New York City, of counsel), for appellant.

Burlingham, Veeder, Masten & Feary, of New York City (Roscoe H. Hupper and William J. Dean, both of New York City, of counsel), for appellees.

Before ROGERS, MANTON, and HAND, Circuit Judges. ·

MANTON, Circuit Judge. The appellant, a steamship company, on October 13, 1917, contracted to transport 1,500 tons of coffee from New York to Havre, at a stipulated freight rate. It failed to transport 1,048 tons contracted for October-November, 1917, but gave notice of the cancellation of this contract November 15, 1917. The question presented by this appeal is whether it lawfully canceled the contract. In its answer to the libel, it pleaded conditions contained in the contract. It alleged that, on account of the contingencies happening as embraced within the terms of these conditions of the freight contract, the appellant was unable to carry out its contract to transport the coffee; that on account of its steamers being lost, damaged, and commandeered it was prevented from the fulfillment of the terms of the freight contract.

Terms of the contract are as follows: "This contract is accepted subject to the conditions specified in line bill of lading, and is further conditional upon the continuance of the steamship company's service and the sailing of its steamers. Carriers shall not be liable for any loss, damage, or delay resulting directly or indirectly from war or hostilities between any powers."

And the following: "And is further conditional upon the continuance of the steamship company's service and the sailing of its steamers, and if at any time in the judgment of the steamship company conditions of war or hostilities, actual or threatened, are such as to make it unsafe or imprudent for its vessels to sail, the sailing of any vessel or vessels may be postponed or canceled, and in that event the steamship company may at its option cancel this contract, and shall be relieved thereafter from any liability hereunder, except to return to the shippers whatever cargo may have already been received under this contract."

On October 13, 1917, the federal government, acting through the United States Shipping Board, gave notice to the appellant that all ships registered and controlled under the laws of the United States (this included appellants' ships) were commandeered on October 15, 1917. On September 13, 1917, the Edgar F. Luckenbach and the Julia Luckenbach, appellants' vessels, were requisitioned for immediate military purposes. The appellant chartered some ships and owned others. All ships over 2,500 tons were commandeered by the government, and this, of course, included both chartered and owned vessels. There is evidence that some of their vessels were sunk by the enemy. It is argued from all this that the appellant was prevented from the continuance of its business, including the transportation of the coffee contracted to be transported. The general commandeering order was given October 13, 1917, and became effective October 15, 1917. Thereafter it had no sailings on its own account. Under clause 5A of the order commandeering ships, it was provided:

*Certiorari denied 45 S. Ct. 510, 69 L. Ed. —.

"(a) Owners who are operating their steamers in the regular trade are for account of the government and as they have been doing for themselves until they receive further instructions. (b) The owners whose steamers are chartered to others may apply to the Shipping Board for instructions regarding the future employment of the said steamers."

Thereafter the operation of the vessels was under the control of the government as to sailings and cargoes to be carried. After the appellant's fleet was taken over by the government through the commandeering order, one cargo of coffee was carried in November, 1917, but that was a government operation. Efforts were made by the appellant to complete the transportation of the balance of the coffee contracted for by appealing to the Shipping Board, and this failed. A letter of cancellation was sent to the appellees on November 16, 1917, which read as follows:

"As a result of the loss of two of our steamers by enemy submarines, and serious damage to two others of our steamers in the war zone, our freight service from New York to Havre has been interrupted, and we herewith notify you, under the following clause contained in the contract: 'This contract is accepted subject to conditions specified in line bill of lading and is further conditional upon the steamship company's service and the sailing of the steamers. Carriers shall not be liable for any loss, damage, or delay resulting directly or indirectly from war or hostilities between any powers. Luckenbach S. S. Co., Inc., ————,' that we will, therefore, be unable to provide steamer space on our steamers for the cargo mentioned, and that the cargo is thereby canceled."

It is argued that the letter of cancellation did not state the reasons which under the terms of the freight contract would legally excuse the appellant from performance. In other words, it is said that the letters limited the reasons for the refusal to carry the balance of the cargo, and we are referred to the authority of Luckenbach Steamship Co., Inc., v. W. R. Grace & Co., Inc. (C. C. A.) 267 F. 676. In that case the letter of the steamship company placed its refusal to perform the contract on the grounds of restraint of princes only, and at the trial another excuse was offered. By the letter of November 16th attention is called to the shipper of the conditions specified in the line bill of lading, as well as to specific conditions therein expressed as to the continu-

ance of the steamship company's service and the sailing of their steamers. It is clear from the language of the conditions above quoted that the contract would be carried out during the continuance of the appellant's service. The parties acted upon the assumption that the plaintiff's ships would continue to be available, and the record shows that some ships were lost, others were damaged, and the balance commandeered by the government. It thus appears that the entire fleet of the appellant was made unavailable for the performance of this contract.

[1] Where parties enter into a contract on the assumption that some particular thing essential to its performance will continue to exist and be available for that purpose, and neither agrees to be responsible for its continued existence and availability, the contract must be regarded as subject to an implied condition that, if before the time for performance and without the default of either party the particular thing ceases to exist or be available for the purpose, the contract shall be dissolved and the parties excused from performing it. Texas Co. v. Hogarth Shipping, 256 U. S. 619, 41 S. Ct. 612, 65 L. Ed. 1123; Quina Export Co. v. Seebold (C. C. A.) 287 F. 626; Allanwilde Corporation v. Vacuum Oil Co., 248 U. S. 377, 39 S. Ct. 147, 63 L. Ed. 312, 3 A. L. R. 15. In the last case clearance on sailing vessels bound for the war zone was refused, and made it impossible for the ship to clear. There was no provision in the contract, excepting "the restraint of princes, rulers, and peoples." The court held that the vessel was prevented from making this voyage by the interdiction of the government, and that such impediment excused performance. In The Isle of Mull (C. C. A.) 278 F. 131, it was held that, where the availability of the vessel came to an end by requisition of the government under circumstances beyond the control of the parties, the contract is prima facie regarded as dissolved.

[2] The conditions that prevented the appellant from carrying all of the 1,500 tons of coffee were pleaded as a defense and were established by ample proof at the trial, for it was shown that their ships were not available and it was prevented by reason of these conditions from carrying out the contract. These facts proved the involuntary discontinuance of the steamship company's service and the sailing of its steamers by reasons of condition of war or hostilities. These were actual conditions. They were sufficient to justify the decision on the part

of the appellant that it was not safe for its vessels to sail, and this justified the cancellation of the contract. It relieved the appellant from any liability thereunder, except to return to the shippers whatever cargo may have been already received under the contract. It is established that an effort was made under subdivision 5A of the order commandeering the vessels to carry the cargo, and this was refused.

Nor may the appellant be held responsible because it failed to show that it could not secure ships to carry the cargo, or because of its failure to show an attempt to do so was made. One witness testified that at this time all of the ships were gradually being commandeered from all the companies for war purposes, and he was asked:

"Q. And that you say was why the total amount of goods was not carried? A. Absolutely."

The libel alleges that the appellees were "unable to secure other means of transportation for said 1,048 tons of coffee," and sought recovery in this suit for the damages sustained accordingly. But we think that, in view of the clauses of the freight contract referred to, sufficient reasons appeared to justify the appellant's cancellation of the contract. For these reasons, the decree is reversed.

Decree reversed.

ROGERS, Circuit Judge (concurring). I concur in the result reached in the above opinion. The contract between the parties consists, as the court below found and as this court holds, in three separate contracts, one dated on October 3, 1917, another dated on October 10, and the other dated on October 16, all in the same year. Those contracts show the parties, subject-matter, terms, and consideration. Each of these contracts contained the following statement:

"This contract is accepted subject to the conditions specified in line bill of lading, and is further conditional upon the continuance of the steamship company's service and the sailing of its steamers. Carriers shall not be liable for any loss, damage, or delay resulting directly or indirectly from war or hostilities between any powers."

On October 13, 1917, the respondent received the following telegram from Washington: "The United States Shipping Board hereby gives notice to all owners of ships registered and enrolled under the laws of the United States that the requisition of all American steamers described below and of which previous announcement has been made, will become operative and effective on October 15, 1917, at noon."

The following is an excerpt from the testimony: "After the government had taken over by commandeering the steamers of the steamship line, had you any other steamers owned by or operated by the Luckenbach Steamship Company, after October, to carry that contract? A. No, sir; our last company operation was the sailing of October 13, 1917."

On November 16, 1917, the respondent notified the libelant as follows: "As a result of the loss of two of our steamers by enemy submarines, and serious damage to two others of our steamers in the war zone, our freight service from New York to Havre.has been interrupted, and we herewith notify you, under the following clause contained in the contract: 'This contract is accepted subject to conditions specified in line bill of lading, and is further conditional upon the continuance of the steamship company's service and the sailing of its steamers. Carriers shall not be liable for any loss, damage, or delay resulting directly or indirectly from war or hostilities between any powers. Luckenbach S. S. Co., Inc., ——,' that we will, therefore, be unable to provide steamer space on our steamers for the cargo mentioned, and that the contract is thereby canceled."

The general freight agent of the respondent at the time involved herein testified to the reason why the respondent did not fully perform its contract to carry all the freight under the agreements it made with the libelant. The following is an excerpt from his testimony:

"Q. Do you recollect yourself the times that each of the vessels were commandeered by the government of the steamship company without referring to the memorandum, or do you want to refer to the memorandum? A. I could not recollect offhand the dates at the present time.

"Q. I understood you to say you do know the Luckenbach Steamship Company had no ships of their own they could use to carry the balance of this cargo of coffee? A. No.

"Q. Now, then, the steamships—who were operating them, the steamships belonging to the Luckenbach Steamship Company? Who was operating them? A. You mean were they under the government?

"Q. Yes, under the government. Were you operating them or the government? A. We were acting as agents for the government.

"Q. Now, under whose instructions did you carry any cargo on those ships? A. Under the government's instructions."

The testimony also showed that after the ships were requisitioned the officers of the respondent company attempted to obtain the release of the vessels, so that they could carry the balance of the freight belonging to the libelant, and which the respondent had contracted conditionally to carry. The general freight agent, after testifying that the vice president of the company went to Washington to obtain the consent of the government to the release of the vessels, so that they might carry this freight, testified as follows:

"Q. What did he go there for? A. To get all the space he possibly could.

"Q. And was he able to accomplish it? A. No, sir; he was not.

"The Court: You don't know what he was able to do.

"By Mr. Carter: Q. Did you get the vessels released so as to move these shipments of coffee? A. No, sir."

The vice president of the respondent was asked whether all of its steamers were taken by the government pursuant to the telegram, and answered:

"Every piece of floating property we owned was taken as a result of that telegram, or similar individual requisitions."

It appears, therefore, that the contract to carry was not absolute, but conditional; that the condition upon which it depended was the continuance of the steamship company's service, and that service did not continue, but was terminated by the United States government under the telegram of October 13, 1917; and that that requisition became operative on October 15, 1917, at noon. In view of all the facts, the letter of cancellation of November 16, 1917, was amply justified.

There was no reason, in my opinion, why it was necessary to show that the libelant made any effort to arrange with other lines to carry the libelant's freight, in view of the fact that its obligation was conditional, and not absolute, and the condition had arisen which excused performance. See Compagnie de Trefileries v. France & Canada Steamship Co., 192 App. Div. 709, 183 N. Y. S. 169, aff'd 233 N. Y. 596, 135 N. E. 932. The important consideration in this case is, as it was in Texas Co. v. Hogarth Shipping Co., 256 U. S. 629, 631, 41 S. Ct. 612, 65 L. Ed. 1123, that the contract became impossible of performance through the supervening act of the government of the United States.

HAND, Circuit Judge (dissenting). The contract may be treated as made by the letters of September 25 and 26, 1917, or by the subsequent formal contracts of October 3d, 10th, and 16th. If the first view is right, then the appellant showed no excuse, since nothing short of frustration would serve. I can find no iota of evidence in the record that the appellant could not have secured some sort of cargo space for the coffee. If the second view is right, as I think, then we must have recourse to the excuses provided in the formal contracts.

Before doing so, however, we must examine the situation when the contracts were made. The following ships had been commandeered by the government: The Edward Luckenbach on June 4th, the Florence Luckenbach on June 21st, the Edgar F. Luckenbach on September 13th, and the Julia Luckenbach on the same day. The appellant agreed to lift the coffee without the aid of these vessels, at least with the chance that they would not be available. Again the general requisition of all its ships was made on October 13, 1917, three days before the last contract was made. Plainly that was not regarded as to that contract as of itself an excuse. More than that, if it did not apply to the last contract, we are bound to say that this practical construction of the language was applicable to exactly the same language in the two earlier contracts as well. In short, while the appellant might show in fact that the government took all the space on all its fleet, the requisition of itself was not an excuse.

The J. L. Luckenbach was shelled in October, but Thackera says that she remained in the government service, by which I understand that she went on under the requisition of October 13th. The Pleiades was specifically requisitioned on November 2d, but as she in fact lifted 2,500 bags of this very commitment after that date, clearly she was only contingently beyond the appellant's control. While the Harry Luckenbach was eventually torpedoed, it was after the contract was cancelled. Thus of the fleet available on October 3d to 16th only two had certainly been lost, the Lewis and the D. W. Luckenbach, which were torpedoed in October. I can find no evidence in the record of any other changes in the appellant's carrying capacity, if we count out the general requisition for the reasons already given.

One ground of my brothers' decision is

that the appellant had reserved the right to cancel in case in its judgment "the conditions of war and hostilities" made it "unsafe or imprudent for its vessels" to sail. That I submit created only an option to cancel on that ground, and the letter of November 16th, which did cancel, was not an exercise of the option. The case does not raise the question, therefore, whether a promisor may excuse himself on other grounds than those which he gives at the time he repudiates. The excuse did not arise at all until he exercised the option, and the letter only gave as an excuse that the service had been interrupted, which it had not, except as I have already tried to state.

The other ground of the decision is the general requisition. As I have already shown, the appellant may not avail itself of this; but, if it might, it proves too little. The requisition directed owners "to continue the operation of their steamers for account of the government, as they have been doing for themselves." I read this to be no more than that the government would get the profits and accept the losses, but that, in the absence of contrary orders, the owners should fill their commitments. To make an excuse it must have been followed by proof that the government had excluded the cargo in question, and there is no such proof. It is possible that the truth is so, but we cannot decide the case on surmise.

Malins was the libelant's broker, and he did say that the appellant did not carry the goods because all ships were being gradually commandeered. All he could have known was at secondhand, and I cannot treat this testimony as sufficient proof that the appellant could not have got other vessels, and certainly not that they could not have carried this cargo in their own ships. Nor does any of the testimony satisfy me that this last was the fact. The witnesses clearly assumed that the requisition was itself enough to excuse them as to these ships merely because the government controlled the space. The appellant was obliged to go further, and to show in detail what space the government used, what they used for their own cargo, and what they were forced to exclude. Such loose expressions as the record contains do not carry this burden.

We cannot reverse this decree without assuming facts from the general condition of shipping in the autumn of 1917, in respect of which we may or may not be right, and of the commitments of the appellant, which we do not know at all. It is impossible to say whether they gave preference to others than the appellees, or whether they were prevented from carrying any cargo at all. Especially since the contracts are to be read with the general requisition as an existing fact, the excuse ought to be made out with certainty that the government's action under it actually prevented the carriage. In addition and conclusion, as I said at the outset, I cannot find anywhere any proof that the appellant could get no other vessels. I agree that the possibility appears somewhat fanciful when we recall that period, but I cannot agree that our recollection will take the place of proof. Indeed, while I rather suspect generally that the result below was in fact unjust, I do not see how, on this record, any other could have been reached.