## THE LOUISE.

### No. 2570.

District Court, D. Maryland.

Jan. 16, 1945.

See also 54 F.Supp. 157.

Bigham, Englar, Jones & Houston, of New York City, and George W. P. Whip, of Baltimore, Md., for cargo interests.

Bernard J. Flynn, U. S. Atty., and Thomas J. Kenney, Asst. U. S. Atty., both of Baltimore, Md., for intervening cargo libellant.

Francis H. Galloway and Southgate L. Morison, both of Baltimore, Md., for libellants.

Forrest E. Single, of New York City, and Charles F. Stein, Jr., of Baltimore, Md., for claimants and respondents.

CHESNUT, District Judge.

The question now presented in this case is whether, under the particular facts, the cargo owners may recover prepaid freight, in view of the bill of lading provision that it was not to be returned "ship lost or not lost", and though the voyage was frustrated. The question arises in this way:

This case in admiralty originated by the filing of libels by cargo owners, and seamen for wages, against the "Louise." After hearing on the question of liability an interlocutory decree establishing it was entered in consequence of findings of fact and conclusions of law and opinion in The Louise, D.C., 54 F.Supp. 157. The case was then referred to Mr. Vernon Miller, an experienced admiralty lawyer of the Baltimore Bar, for determination of damages. On September 2, 1944, the special master filed a detailed and elaborate report allowing damages for the wage claims and the cargo owners respectively.

The shipowner, M. N. Cavalliotis, has filed numerous exceptions to the master's report; but all have been abandoned except those which relate to the allowance by the master of prepaid freight, and added cost of shipment of cargo, in an aggregate amount of about $50,000, as an element of damages to the respective cargo owners. At the hearing on these exceptions counsel for the shipowner made the contention that the effective cause of the frustration of the voyage was not the unseaworthiness of the vessel (without due diligence by the shipowner) but was due to the requisition of the vessel by the United States Government. The facts on which this contention was based were not specifically developed in

the hearings before the master although the shipowner had opportunity to do so. I therefore permitted further testimony to be introduced bearing on this particular point, and at the conclusion of the hearing this additional testimony was summarized from the Bench in tentative findings of fact which may be now further condensed as follows:

The "Louise" sailed from Wilmington, Delaware, on July 19, 1942, with a cargo of explosives in good order for carriage to various Puerto Rican and Venezuelan ports. The vessel laid over at Hampton Roads, Virginia, until August 10, 1942, awaiting the formation of a convoy. She sailed from Hampton Roads on that date but after less than a day at sea, was obliged to put back to that port by reason of her unseaworthy condition without unusual stress of weather. From there she proceeded to Baltimore, arriving August 12, 1942. The explosives being in a dangerous condition as a result of sea water, the Port Authorities required as a safety measure that the cargo should be unloaded and put in a magazine. The shipowner requested the cargo owners to advance $5,000 for this purpose, stating that he was financially unable to do so. He also demanded from them general average bonds which they declined to furnish under the circumstances. Despite his stated financial inability, the shipowner nevertheless on September 1, 1942, wrote to the cargo owners that the ship would be repaired and continue her voyage. He testified that during September and up to October 17, 1942, he spent $10,000 on repairs which sum he was able to borrow. He said that on October 17, 1942, he was surprised to receive notice from the War Shipping Administrator that the ship was requisitioned; and under contract with the Administrator, he agreed to make further repairs for which he was paid by the Administrator $15,000.

I find the cargo owners were justified in believing (from the shipowner's conduct) that he in effect had abandoned the voyage despite his letter. In view of the requirements of the Port Authorities for safety, the cargo owners were obliged to take possession of their goods and make arrangements for the re-shipment of those goods which had not been destroyed. Some of the cargo was re-shipped by another vessel on or about September 15, 1942. It consisted of explosives consigned to the Arundel Corporation for war defense projects in Puerto Rico. Other portions of the cargo were shipped at later dates after October 17th.

The shipowner gave no further notice to the cargo owners with respect to the voyage after September 1, 1942, and they were not informed of the requisition of the ship until on December 7, 1942, the War Shipping Administrator filed a petition in this court for the possession of the ship, which was then in the custody of the marshal of the court under libels which had been filed by seamen for wage claims in the amount of more than $2,000, and by the cargo owners for much larger amounts. The petition recited that the Administrator, under authority of section 902 of the Merchant Marine Act of 1936, as amended, 46 U.S.C.A. § 1242, had requisitioned and taken over the title to and possession of the "Louise" effective on the 17th day of October, 1942. On the same day an order of court was filed directing the marshal of the court to comply with the requisition and to surrender the ship to the War Shipping Administrator, the court retaining jurisdiction to the end that the case should proceed to final decree, and the fund constituting compensation under the Act for said vessel to be substituted for the vessel itself, which compensation should be collected by the owner and the marshal of the court acting jointly, and deposited in the registry of the court; and the libellants to have the same rights in respect to the matter of determination of just compensation as the owner of the vessel had. Some time after December 7, 1942, the "Louise" sailed from Baltimore and shortly thereafter was lost at sea off the Atlantic Coast under circumstances as to which there is no satisfactory evidence, but apparently not due to enemy action. Before sailing she had been surveyed by a marine surveyor who recommended to his superiors that a seaworthy certificate be given to her but the recommendation was not acted on before the loss of the ship was reported, and no certificate was in fact ever given.

When the ship returned to Baltimore in August, Commander Cabernagel of the Coast Guard, which then had jurisdiction over the vessel as to fitness of condition, found that the repairs which he had previously required to be made before her original sailing, had not been made in good faith and he then gave a long itemized written statement of what repairs would be necessary before a license could be

again issued to the ship, and then only with the condition that it would be valid for a distance not more than fifty miles off-shore. Some time after receiving this requirement from Commander Cabernagel, the shipowner changed the ship from American to Panamanian registry, thus removing the ship from the jurisdiction of the Coast Guard.

The highly unseaworthy condition of the ship on her original sailing from Wilmington, Delaware, on July 19, 1942, will be found in the findings of fact on the question as to liability. From the testimony given on the question of liability and from the further testimony now given on this hearing, I find as a fact that the unseaworthy condition of the ship was due to gross negligence of the shipowner. The repairs which the Coast Guard had required to be made as a condition to obtaining a license to sail, were not carried out in good faith by the shipowner.

The bill of lading contained what has now become a very customary provision with regard to prepaid freight. In part it provides that "in any and all cases, full freight to destination * * * shall be deemed to be completely earned upon receipt of the goods by the carrier * * *," without deduction or refund in whole or in part "ship and/or cargo lost or not lost, and even if the voyage be changed, frustrated, abandoned or otherwise broken up." The bill of lading also contained the usual clause with regard to excepted peril of "restraint of princes". It also contained the customary general average clause.

The amount of prepaid freight in this case was about $35,000. In computing the damages to which the cargo owners are entitled, the master has included an item of the prepaid freight with respect to that portion of the cargo which was destroyed or otherwise not re-shipped to destination, and has also allowed the costs of re-shipment in other cases. The total damages thus allowed with respect to freight aggregate about $50,000. The exceptions that are pressed relate to these items of damages allowed by the master.

In the instant case I find that the unseaworthiness of the "Louise" was the efficient cause of the damage and loss to the cargo owners. The argument to the contrary on behalf of the shipowners is based almost entirely on the case of The Malcolm Baxter, Jr., 277 U.S. 323, 48 S.Ct. 516, 72 L.Ed. 901. The master considered this in his report and concluded that it did not rule this case. I agree with that conclusion.

The general rule of admiralty is that freight is not earned by the ship unless the contract of carriage is completed. Robinson on Admiralty, p. 590. But where the bill of lading, as in this case, contains a clause that prepaid freight is not to be refunded though the vessel be lost or the voyage not completed, it has been given controlling effect where the voyage was broken up by legal impossibility of performance, without fault on the part of the shipowner. This has been established by three Supreme Court cases. Allanwilde Transp. Corp. v. Vacuum Oil Co., 248 U.S. 377, 39 S.Ct. 147, 63 L.Ed. 312, 3 A.L.R. 15; International Paper Co. v. The Gracie D. Chambers, 248 U.S. 387, 39 S.Ct. 149, 63 L.Ed. 318; Standard Varnish Works v. The Bris, 248 U.S. 392, 39 S.Ct. 150, 63 L.Ed. 321. In all these cases the ship was without fault and the voyage was frustrated by a government embargo. However, in the case of The Malcolm Baxter, Jr., supra, the ship was initially at fault in that when she originally sailed she was unseaworthy due to a "hog" or camber in her keel, a structural weakness dangerous to the ship in heavy weather which should have been discovered by due diligence, but was not. The ship sailed from New Orleans bound for Bordeaux, but was forced to put in to Havana for repairs. While undergoing repairs, the government placed an embargo against the ship which after satisfactorily completing repairs, sailed to New York where her cargo was delivered to the shippers, and by them subsequently re-shipped to destination. It was held that the cargo owners were entitled to recover for the damages to the cargo due directly to her unseaworthy condition but were not entitled to recover for the prepaid freight as the legally established efficient cause of breaking up the voyage was not the unseaworthiness but the subsequent embargo. See also Globe & Rutgers F. Ins. Co. v. United States, 2 Cir., 105 F.2d 160, 166.

In this case counsel for the shipowner analogizes the requisition of the "Louise" by the War Shipping Administrator to the embargo in the case of the Baxter, and the other cases above cited. Whether the analogy is entirely sound, I think it is unnecessary to decide in this case. The evidence is not very satisfactory with respect to the time when or the circumstances under

which the ship was requisitioned. Counsel for the cargo owners states that he was unable to obtain the testimony of the officials who acted for the War Shipping Administrator as they were no longer available in Washington, but apparently were in distant parts, probably due to war service. However, the fact of the requisition of the title to the ship seems to be clearly enough established by the petition of the War Shipping Administrator filed in this court on December 7, 1942. Nevertheless it occurs to me that there may be valid differences between the effect of an embargo against sailing to ports of destination named in a bill of lading, and the requisition of a particular ship, with respect to the recovery of prepaid freight. An embargo raises a legal obstacle against any sailing of the particular vessel or other vessels of the same class to the destination; while the requisition of a particular ship does not forbid the reshipment of the goods in some other available ship. It is true that the bill of lading of course contemplated the shipment of the goods by the particular ship; but it seems highly inequitable to allow the shipowner to retain the freight and perform no services whatever for the consideration received when it would have been still entirely lawful for some other ship to carry the goods to destination. We may suppose a case where the ship is requisitioned by the government the day after the goods are loaded on board and the freight prepaid and where the shipowner can readily obtain another ship of the same general class to make the voyage. I do not think it is at all clear that in such circumstances the shipowner is entitled to retain the prepaid freight under this customary bill of lading clause. Then again in the case of an embargo either the ship or the cargo owners must sustain some loss, and the question is only on whom the loss shall fall. But in the case of the requisition of a ship by the government, fair compensation is paid the shipowner who thus sustains no real loss. If he is allowed to retain the prepaid freight also, he receives an unearned increment which seems to constitute unjust enrichment, as a result of unanticipated and unavoidable governmental action. For the effect of the requisition of a ship upon a charter party, see the interesting discussion by District Judge Rose, in the Isle of Mull, D.C., 257 F. 798, reversed by the Fourth Circuit, 278 F. 131; Texas Co. v. Hogarth Shipping Co., 256 U.S. 619, 41 S.Ct. 612, 65 L.Ed. 1123; The Laurent Meeus, 9 Cir., 133 F.2d 552, 1943 A.M.C. 415, 424. These cases hold that the embargo dissolves the charter party; leaving the shipowner and the charterer without obligation in the future to one another, unless the requisition is for a very temporary duration; but the parties remain liable for their mutual obligations in the past. But the effect of a requisition of a ship with respect to prepaid freight, where the ship has not "broken ground," seems to present different considerations. There the cargo owner remains bound, but the shipowner is not, if he is to retain the freight. In ordinary contract law the situation is that of a failure of consideration, which requires the return of the money paid. The shipowner does not lose because he is compensated by the requisitioning power.

But however that may be, in my opinion the shipowner is not entitled to retain the prepaid freight under the circumstances of this case. In The Malcolm Baxter, Jr., the ship deviated from her prescribed voyage to enter a port of safety for repairs. While there the embargo was laid which frustrated the voyage. But under the facts of the case the master of the ship, on starting from port, had no reason to anticipate that a deviation would be necessary. The question was whether the ultimate loss to the cargo owners was legally due to the deviation necessitated by the development of the unseaworthiness, or by the embargo. The court held that the deviation was involuntary, and therefore the embargo was the effective cause of the frustration of the voyage. At page 331 of 277 U.S., at page 517 of 48 S.Ct., 72 L.Ed. 901, Justice (now Chief Justice) Stone said: "Unseaworthiness alone, or deviation caused by it, displaces the contract of affreightment only in so far as damage is caused by the unseaworthiness (citing cases). But if the deviation here is to be classed with voluntary deviations, respondent may not claim the benefit of the clauses of the bill of lading and is responsible for the cargo as insurer. The Willdomino [v. Citro Chemical Co.], 272 U.S. 718, 47 S.Ct. 261, 71 L.Ed. 491.", (citing other cases). In The Willdomino v. Citro Chemical Co., 272 U.S. at page 727, 47 S. Ct. at page 262, 71 L.Ed. 491, it was said "An emergency sufficient to excuse the departure cannot arise out of circumstances deliberately planned nor from gross negli-

gence." As previously stated, I find the unseaworthiness of the "Louise" which forced her to return to Baltimore was due to the gross negligence of the shipowner. He obtained from the Coast Guard a license permitting the "Louise" to sail after failing in good faith to make prescribed repairs. The history of the ship and the repairs which were required to be made appear from the testimony in the main case on liability briefly summarized in the findings of fact and further emphasized by the additional testimony taken at the recent hearing. The "Louise" was flagrantly unseaworthy for her original voyage. Any reasonably careful and prudent owner must have known this. To permit the shipowner to receive and retain the prepaid freight under the circumstances here would be tantamount to a fraud on the cargo owners. Under the facts of this case the return of the ship to Baltimore must be classed as a voluntary deviation; and the legally efficient cause of the breaking up of the voyage was her unseaworthiness and not the requisition of the ship.

As heretofore noted, the bill of lading contained a "general average" clause made applicable despite the unseaworthiness for which the carrier was not responsible by statute, contract or otherwise. The wording of this latter provision is similar to what has been in recent years called the "Jason" clause. The shipowner contends that the cargo owners improperly refused to post general average bonds or to contribute to a general average adjustment in accordance with this bill of lading clause. But I conclude there is no merit in that contention. The ship was clearly at fault by being unseaworthy (without due diligence) at the start of the voyage. And under the facts there was no obligation on the part of the cargo owners to contribute to a general average settlement. May v. Hamburg-Amerikanische Packetfahrt Aktien-Gesellschaft, 290 U.S. 333, 54 S.Ct. 162, 78 L.Ed. 348; Aktieselskabet Cuzco v. Sucarseco, 294 U.S. 394, 55 S. Ct. 467, 79 L.Ed. 942. But the insistence thereon by the shipowner without justification was an added circumstance to indicate that the shipowner had abandoned the voyage at Baltimore.

Much is said in argument by counsel for the shipowner that some of the cargo owners did not give the shipowner a reasonable time to repair the "Louise" and resume the voyage. It is true that the explosives belonging to the Arundel Corporation were very promptly re-shipped, and under ordinary circumstances they might be considered to have been prematurely re-shipped without giving the shipowner a reasonable time to repair. The general rule is that when a voyage is interrupted by the necessity for repairs to the ship the latter has a right to carry on the cargo to the port of destination if the ship be capable of repair within a reasonable time and when repaired of carrying the cargo to port of destination. In such a case if the cargo owners insist upon taking the cargo short of destination the ship nevertheless is considered to have earned the full freight, or at least a fair proportion of the freight. Robinson on Admiralty, pp. 584–592.

But the situation in the instant case was not of this usual type. It was apparent when the vessel returned to Baltimore or shortly thereafter, that the vessel had been unseaworthy at the start of the voyage. It was at least very uncertain that the ship could be made seaworthy to resume the carriage of the cargo to destination; the ship was libelled and in the custody of the court and had not been released upon stipulation, and the shipowner had stated his financial inability to care for the cargo thus forcing the cargo owners to resume its possession; and the shipowner had unjustifiably demanded a general average adjustment. Under these circumstances the cargo owners were amply justified in believing that the shipowner had abandoned the contract of carriage and were justified in prompt re-shipment of their respective goods to avoid further loss. We also know from the evidence that the ship was not released from the legal custody of the marshal of the court under the libels until she was requisitioned by the War Shipping Administration, the shipowner apparently being unable to furnish the usual stipulation to obtain her release. Nor is the evidence in the case satisfactory that the ship was ever in fact repaired to such an extent that she was capable of carrying the particular cargo forward to destination.

For these reasons the exceptions to the master's report must be overruled. Counsel may submit the appropriate order in due course.