## ATLANTIC FRUIT CO. v. SOLARI et al.

(District Court, S. D. New York, September 11, 1916.)

1. SHIPPING ⬅39—BREACH OF CHARTER—"LAWFUL MERCHANDISE."

Contraband goods, carried by a neutral vessel from a neutral country to a port of a belligerent in time of war, are "lawful merchandise," within a clause of the charter party limiting her use to the carriage of such merchandise, where the export of such goods was not prohibited by the laws of the country from which the shipment was made.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 141–148; Dec. Dig. ⬅39.

For other definitions, see Words and Phrases, First and Second Series, Lawful Merchandise.]

2. SHIPPING ⬅38—BREACH OF CHARTER—"RESTRAINT OF PRINCES."

Where a Dutch vessel, under a time charter to libelant, an American company, and subchartered, also by time charter, to respondents on arrival at an Italian port with a contraband cargo, was prohibited by the Dutch government from leaving port under the charter for any voyage while the vessel was under charter to the charterers or subcharterers, the order being modified after some months by permitting her to proceed, but on condition that she should not trade to any port of a belligerent country, such action constituted a "restraint of princes," within a mutual ex-

ception of such risk in the charter, and was such a frustration as justified the subcharterers in abandoning it.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 136–140; Dec. Dig. ⊙⇒38.

For other definitions, see Words and Phrases, First and Second Series, Restraint of Princes.]

In Admiralty. Suit by the Atlantic Fruit Company against Luigi Solari and R. Lawrence Smith. On exceptions to libel. Sustained in part.

Hunt, Hill & Betts, of New York City (George Whitefield Betts, Jr., and Francis H. Kinnicutt, both of New York City, of counsel), for libelant.

Gilbert, Lauterstein & Gilbert, of New York City (Abraham S. Gilbert, of New York City, of counsel), for respondent Solari.

Austin, McLanahan & Merritt, of New York City (Scott McLanahan, of New York City, of counsel), for respondent Smith.

AUGUSTUS N. HAND, District Judge. [1] The Atlantic Fruit Company held a time charter for a term of years of the registered Dutch steamers Van der Duyn and Van Hogendorp, and entered into subcharters of these vessels with the respondents. The subcharter of the Van der Duyn was from May 24, 1915, for 10 months, and of the Van Hogendorp from August 4, 1915, to April 5, 1916. Each charter party was on a printed form of the Atlantic Fruit Company, which was the customary government form, and provided that the vessel was to be delivered at New York, and—

"to be employed in carrying lawful merchandise, including petroleum or its products in cases, between safe ports in the United States and the Mediterranean, not east of the west coast of Italy, charterers' option trading to safe French Atlantic ports not north of Brest and safe South American ports not south of the river Plate."

The charter party contained, among others, the following provisions (I quote here, to illustrate, from the charter party of the Van der Duyn):

"[Owners]:

"1. Shall provide and pay for all provisions, wages and consular shipping and discharging fees of captain, officers, engineers, firemen and crew; shall pay for the insurance of the vessel, except as noted in addenda; also for all engine room and deck stores, and maintain her in a thoroughly efficient state in hull and machinery for and during the services, guaranteeing to maintain the boilers in a condition to bear a working pressure of at least within 20 pounds of what is allowed by Lloyds or Veritas (and the pressure to be carried continuously at sea) during the whole term of this charter.

"2. In default of payment of hire, the owner[s] shall have the faculty of withdrawing the said steamer from the service of the charterers without prejudice to any claim they, the owner[s] may have on the charterers in pursuance of this charter."

"26. The act of God, perils of the sea, fire, barratry, of master or crew, enemies, pirates, thieves, arrests and restraints of rulers, princes and people, collisions, stranding or other accidents of navigation excepted, even when occasioned by negligence, default or errors of judgment of pilots, masters, mariners, or other servants of the shipowner[s]. Ship not answerable for losses through explosion, bursting of boilers, breakage of shafts or any latent defect

in the machinery or hull not resulting from want of due diligence by owner[s] of ship, or any of them, or by ship's husband or manager."

"[Charterers]:

"28. Shall pay and provide for all the coals, port charges, pilotages, agencies and commissions, and stevedoring charges.

"29. Shall pay for the use of said vessel $25,000, twenty-five thousand and $^{00}/_{100}$ dollars, U. S. currency, per calendar month, commencing from the time of delivery and at and after the same rates for any part of a month, hire to continue from the time specified for terminating the charter until her delivery to owner[s] (unless lost) at a port in the United States. Payment of said hire to be made in cash in New York monthly in advance for the first month half monthly thereafter."

### "General Conditions.

"40. The act of God, the enemies, fire, restraints of princes, rulers and people and all other dangers and accidents of the seas, rivers, machinery, boilers and steam navigation throughout this charter party always excepted."

Each steamer was delivered to the respondents at New York pursuant to her subcharter. The first voyage of the Van der Duyn was with a cargo of frozen meat from New York to Genoa, which was delivered to the Italian military authorities. The libelant was informed by the respondents that this meat was not shipped or intended for military purposes, but was for consumption by the civilian population. Objections made to carrying this cargo both by the Dutch consul and the master and crew were only obviated by these untruthful statements. The second voyage to Genoa was from Montevideo with a similar cargo of meat, which was delivered to the Italian army in a similar way. On this occasion respondents assured the libelant that the beef was intended for the Italian civilian population. Before leaving Montevideo on this voyage, threats were made to the master and crew by the German ambassador and the Austrian consul at Montevideo that the vessel would be destroyed by submarines because she carried contraband, and the master and crew were only persuaded to sail by representations by the respondents that the cargo was intended for use by civilians. The vessel and the lives of those on her were actually in jeopardy by reason of carrying the contraband goods. The vessel was discharged on September 23, 1915, at Genoa, and the master was then ordered by respondents to clear her and sail to Montevideo. He refused to sail, however, on the ground that the previous carriage of contraband goods had subjected the vessel to risk of destruction by war ships, torpedoes, and mines, and that a subsequent voyage from Montevideo to Italy with meat would involve the same risk.

Between this time and October 19th the government of Holland ordered the Dutch consul at Genoa not to permit the crew to sign "for any voyage while the vessel was under charter to the respondents or libelant," and she was thus prevented from sailing. After negotiations with the Dutch government through the State Department of the United States, during which the libelant endeavored to have the order of the Dutch consul rescinded, the Dutch government decreed that the vessel should not during the present war trade to any port of any country involved or thereafter becoming involved as a belligerent in the war, and that she should not leave Genoa until

the owners and the libelant had signed an agreement to that effect. The owners required of the libelant a payment of $1,000 per month additional charter hire for two years and a lump sum of $1,750 as a condition of entering into the agreement with the Dutch government, and these payments the libelant made. The vessel was then released; the libelant notified the respondents thereof and requested sailing orders. The latter refused to give such orders, and stated that they had no further use for the vessel. On December 18th the vessel sailed for New York, and on January 12, 1916, entered upon a new subcharter under which she is now employed. Libelant was obliged to incur expenses in sending representatives to Holland and Genoa to procure the release of the vessel, and in the employment of agents and attorneys in various places and in other matters, in excess of $17,500.

The steamship Van Hogendorp was only engaged in one voyage from New York to Montevideo, and thence with frozen meat to Genoa, which was delivered to the Italian army, after representations by the respondents that the cargo was only for the civilian population of Italy. Otherwise, similar things occurred as in case of the Van der Duyn; that is to say, the master refused to return to Montevideo and the Dutch consul took the same steps as in case of the Van der Duyn, after which this vessel was similarly freed with permission to engage in a limited trade and repudiated by the respondents.

Hire was paid to October 26, 1915, in the case of the Van der Duyn and to October 19th in the case of the Van Hogendorp. On December 14th the Dutch government allowed each vessel to sail from Genoa. The libel seeks to recover full hire between the date up to which the last payments were made and the time when the new subcharters became effective, difference in hire between the old and the new subcharters to the end of the original terms, cost of coal supplied for last voyages from Genoa to New York, port charges while at Genoa, cash required by owners as condition of assurance to Dutch government, additional charter hire required by owners for period of two years, as well as legal and other expenses incurred in freeing the vessels from the embargo by the Dutch government. The claims as set forth in the libel aggregate $275,797.29.

The respondents have excepted to the libel on the ground that it states no cause of action. This, like a demurrer, admits all the foregoing allegations of fact in the libel. The respondents contend that they had a perfect right under the law to carry contraband, and that the refusal of the vessels to sail because of the exercise by the respondents of their lawful right to carry the contraband was a breach of the charter party by the libelant, which bars recovery upon it.

The libelant insists that the vessels could only carry "lawful merchandise," that this term did not include, but excluded, contraband goods, and that for that reason, not only hire unpaid prior to the new subcharters, but all losses and damages, are recoverable. Libelant also insists that, even if contraband goods could be carried under the charter, the situation confronting the masters of these vessels constituted such a peril as justified them in protecting their ships and

refusing to sail. Libelant further says that restraint of princes occurred by reason of the existing circumstances, that the actual embargo and subsequent limited permission to trade granted by the Dutch government also constituted a further restraint of princes, excepted by the charter parties, and that during such restraint charter hire was payable under the law. The libelant, therefore, insists that loss of charter hire and coal and port charges are in any event due, even though the other expenses occasioned by the carriage of contraband may not be recoverable.

There are but few cases where the term "lawful merchandise," or similar language, has been construed by the courts. In the old case of Seton, Maitland & Co. v. Low, 1 Johns. Cas. 1, the New York Supreme Court held that "lawful merchandise" in a marine insurance policy included contraband goods. Chancellor Kent there said:

"Two questions were raised, on the argument in this case: (1) Whether the contraband goods were lawful, within the meaning of the policy. (2) If lawful, whether the assured were bound to disclose to the defendant the fact that part of the cargo was contraband of war.

"On the first point, I am of opinion that the contraband goods were lawful goods, and that whatever is not prohibited to be exported, by the positive law of the country, is lawful. It may be said that the law of nations is part of the municipal law of the land, and that by that law (and which, so far as it concerns the present question, is expressly incorporated into our treaty of commerce with Great Britain) contraband trade is prohibited to neutrals, and, consequently, unlawful. This reasoning is not destitute of force, but the fact is that the law of nations does not declare the trade to be unlawful. It only authorizes the seizure of the contraband articles by the belligerent powers; and this it does from necessity. A neutral nation has nothing to do with the war, and is under no moral obligation to abandon or abridge its trade; and yet, at the same time, from the law of necessity, as Vattel observes, the powers at war have a right to seize and confiscate the contraband goods, and this they may do from the principle of self-defense. The right of the hostile power to seize, this same very moral and correct writer continues to observe, does not destroy the right of the neutral to transport. They are rights which may, at times, reciprocally clash and injure each other. But this collision is the effect of inevitable necessity, and the neutral has no just cause to complain. A trade by a neutral, in articles contraband of war, is therefore an unlawful trade, though a trade, from necessity, subject to inconvenience and loss."

This decision was followed by the same court in Skidmore v. Desdofty, 2 Johns. Cas. 77, and Juhel v. Rhinelander, 2 Johns. Cas. 120, and the last case was affirmed on appeal by the Court for the Correction of Errors in 2 Johns. Cas. 487. A somewhat similar doctrine was enunciated by Lord Ellenborough in the old case of Barker v. Blakes, 9 East, 283, where it was held that a policy of insurance was not violated by the carriage of contraband cargo. He said:

"The voyage and commerce, therefore, in the course of which the vessel carrying the goods insured was in this case engaged, not being either of a hostile description, nor in any other way expressly or impliedly forbidden by the law or policy of this country, the general objection to the plaintiff's recovering at all under this policy of assurance falls to the ground."

See, also, North. Pac. Ry. v. American Trading Co., 195 U. S. 465, 25 Sup. Ct. 84, 49 L. Ed. 269.

Apparently the opinions of the courts on the subject not only treat ·contraband as lawful cargo, but also as coming within the description ·of the term "lawful merchandise." It is to be borne in mind, also, that much of the carrying trade with Europe during the present war has been in contraband goods, and if what is in fact lawful merchandise under our laws was to be forbidden by the contracts under consideration it would have been an easy matter to exclude contraband in express terms, as was done by the language of the charter party in the recent case of F. A. Tamplin S. S. Co. v. Anglo-Mexican Petroleum Products Co. [1915] L. R. 3 K. B. 668, instead of leaving the matter to a doubtful expression, which had been held to include contraband in the only decisions where the question was squarely up for adjudication. I do not think the fact that petroleum was mentioned in the charters is significant, though that was doubtless contraband, nor do I regard the payment of insurance for war risks by the respondents important. The provision as to petroleum was apparently inserted because it might not be regarded as "lawful merchandise" on account of the possible danger to other cargo occasioned by its presence, and not because of its contraband character. Nor is the argument as to the insurance of war risks more persuasive, for such insurance was most important, as well as common, when hazards to cargoes of all descriptions from floating mines and zealous submarine commanders were so great. The arguments as to these provisions of the charter party have been sufficiently answered by the libelant, but the latter has not answered what appears to me the conclusive argument, that contraband goods were lawful goods and could be properly carried, subject to risk of capture, if there had been no provision as to "lawful merchandise." How merchandise which was under our laws already lawful could be rendered unlawful by providing in the charter party for the carriage of "lawful merchandise," I am unable to perceive.

There is a dictum in the old case of Weston v. Minot, 3 Woodb. & M. 437, Fed. Cas. No. 17,453, and in Boyd v. Moses, 7 Wall. 316, 19 L. Ed. 192, to the effect that contraband goods are not lawful merchandise, but in the first case the remark of the court had no bearing on the issues involved, and the reasons for the opinion expressed were not given. The second case merely quoted the dictum of the Circuit Justice who delivered the opinion in the first. In each case the question involved was whether cargo which was injurious from its intrinsic nature to other cargo violated the charter party, and had nothing to do with contraband.

The Styria, 101 Fed. 728, 41 C. C. A. 639, and affirmed on appeal, as to the general principle involved, in 186 U. S. 1, 22 Sup. Ct. 731, 46 L. Ed. 1027, is the only case really relied on by libelant as tending to decide that contraband is not lawful merchandise. In that case the bills of lading covered "goods of all kinds dangerous or otherwise." A cargo of sulphur was loaded at Palermo for New York. The court held that the captain was justified in unloading it on the outbreak of the Spanish War, because it was contraband, and subjected the ship to capture by war vessels off the Spanish coast. The ground upon which

the decision was placed was the "restraint of princes" clause, though the court incidentally remarked that:

"The ship made no contract to carry contraband of war to the port of a belligerent, and should not be held to the obligations of a contract into which she has never entered."

This language merely means that the "restraint of princes" clause furnished an excuse for refusing to carry contraband, because there was no specific provision to carry such cargo, and the danger of seizure and destruction was an effective restraint. In other words, the "restraint of princes," and not the contraband goods which occasioned the restraint, was a sufficient excuse for refusing to carry the cargo. The court there said:

"There is no logical difference between a restraint of princes and rulers exercised by a cruiser with power to visit, search, and seize, lying two leagues off Cape Empedocle, and that exercised by a half dozen cruisers patrolling a narrow strait through which, if the voyage be made, the vessel must pass. Under such circumstances, the owner of contraband cargo (loaded, as this was, before war broke out) could with reason insist that it would be gross negligence on the part of the ship to bring his cargo forward. * * * That a blockade is within the term 'restraints of rulers and princes' has been settled for the federal courts by the decision in Olivera v. Insurance Co., 3 Wheat. 183 [4 L. Ed. 365]. That a well-founded apprehension of capture by the cruisers of a belligerent is the equivalent of an actual restraint is the doctrine of the later authorities."

See, also, The Kronprinzessin Cecilie, 228 Fed. 948; Rodoconachi v. Elliott, L. R. 9 C. P. 518; Nobel's Explosives Co. v. Jenkins, [1896] L. R. 2 Q. B. 326.

[2] The effect of the foregoing decisions is that a danger of seizure, such as is alleged by the libel, and admitted by the exceptions to it, constituted a "restraint of princes," which excused the libelant under that clause, if not at common law, from proceeding on her voyage on September 23, 1915. This was followed by an actual restraint by the Dutch government until December 18, 1915, and a partial restraint thereafter. It seems to be settled that the regular break-down clause furnishes almost the only excuse for not paying hire, except an actual frustration of the enterprise.

Judge Hough held in The Santona (C. C.) 152 Fed. 516, that a detention in quarantine for 36 hours caused no cessation of hire. The Circuit Court of Appeals of this circuit decided, in Clyde Commercial S. S. Co., Ltd., v. West India S. S. Co., 169 Fed. 275, 94 C. C. A. 551, Ward, J., writing the opinion, that a detention of about 11 days by the Texas authorities did not relieve the charterer from the payment of hire. In Admiral Shipping Co. v. Weidener Hopkins & Co. [1916] L. R. 1 K. B. 429, there was a detention by the Russian government of a month, but Bailhache, J., held that this did not cause a cessation of hire. The same result was reached in the case of Scottish Navigation Co. v. W. A. Souter & Co., [1916] L. R. 1 K. B. 675. In F. A. Tamplin S. S. Co. v. Anglo-Mexican Petroleum Products Co., [1916] L. R. 1 K. B. 485, the Court of Divisional Appeal held that a British vessel on time charter, which was requisitioned by the government, must still pay hire, though the charterer had no use of

her; and such was the decision in Modern Transportation Co. v. Duneric S. S. Co., [1916] L. R. 1 K. B. 726, though in that case the government only paid about half the charter hire agreed upon by the original parties.

The reasoning of these last two cases was that a requisition by the government created an assignment by operation of law of the rights of the charterer, that he would receive hire from the government, and that there was, therefore, not such a frustration of the enterprise as relieved the charterer from the payment of hire. The payment of hire is enforced in such cases because the vessel is chartered subject to the restraint of princes, but in the case at bar the libel alleges that the Dutch government issued a decree or order to the Dutch consul at Genoa not to permit the crew of said vessel "to be signed on or before him for any voyage while the said vessel was under charter to the respondents or libelant." Amended Libel, fol. 70. Thus the Dutch government refused to allow the contract between the owners and libelant to continue in operation, and only after lengthy negotiations between the libelant and the Dutch government, covering a period of about two months, did that government release the steamship and permit the consul to sign the crew, and then only upon condition that the vessel should not trade to any port of any country at war, or any European country that might thereafter become involved as a belligerent in said war.

It is urged that this action by the government, which deprived the subcharterers of the use of the ships for a substantial portion of the charter period, constituted a "frustration," and relieved the respondents from the payment of charter hire, and I agree with this contention. I am well aware of the English decisions which express doubt as to whether any "restraint of princes" can amount to a "frustration" in a time charter. Here, however, was a case where the Dutch government did not, according to the allegations of the libel, simply at one time restrain the sailing of the vessel, but decreed that it would not permit the crew to be signed *"for any voyage while the said vessel was under charter to the respondents or libelant."* This, I think, was a decision to annul completely the rights of the charterers. If the restraint had been a temporary matter pending negotiation, it might very likely be regarded as not sufficient to amount to a "frustration"; but when, under the allegations of the libel, it was coupled with a declaration that the charterers could never use the ship, and continued for about two months, I think the respondents had a right to treat the decree as amounting to a "frustration," which ended relations between them and the libelant. As was said in the case of Embiricos v. Sydney Reid & Co., [1914] L. R. 3 K. B. 45, quoting the remarks of Lord Gorell in The Savona, [1900] L. R. 3 K. B. 252: "I do not think this case can be decided by what happened afterwards."

The law in regard to this matter was laid down by Bailhache, J., in the Admiral Shipping Case, supra, at page 438, as follows:

"Before I part with this case, and to prevent any misconception in the unlikely event of this judgment being referred to on any subsequent occasion, I desire to point out that nothing that I have said has any application to or

bearing upon a case in which the chartered vessel is either lost actually or taken out of the possession and control of the owners by one of the excepted perils, so that the owners are unable to give the charterers the use of their vessel for any purpose whatever."

It is to be remembered that charter hire has apparently been paid up to the time that the Dutch government intervened. Up to that time, I think there had been no "frustration." I cannot tell definitely from the pleading what periods the claims for the various port charges actually covered. So far as these sums were paid for charges prior to the decree of the Dutch government, they are recoverable.

Northern S. S. Co. v. Earn Line, 175 Fed. 529, 99 C. C. A. 151. So far as these expenses were incurred afterwards, they are the burden of the owner. An amended libel must specify how far these items covered the period prior to the Dutch decree.

For the foregoing reasons, I hold that the exceptions to the libel must be sustained, and the libel dismissed, with the usual leave to file an amended libel within 10 days.

---

&#x25C8;&#x2015;For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes