**THE GEORGE J. GOULANDRIS.**

GOULANDRIS BROS. v. BRITISH IRON & STEEL CORPORATION, Limited, et al.

BRITISH IRON & STEEL CORPORATION, Limited, v. GOULANDRIS BROS.

Nos. 1520–1522.

District Court, D. Maine, S. D.

Jan. 27, 1941.

Verrill, Hale, Dana & Walker, of Portland, Me. (Robert Hale, of Portland, Me., of counsel), for plaintiff.

Woodman, Skelton, Thompson & Chapman, of Portland, Me. (N. W. Thompson and R. S. Chapman, both of Portland, Me., and Herbert M. Statt, of New York City, of counsel), for defendant.

PETERS, District Judge.

These three libels, one in rem by the above-entitled British Corporation against the Greek steamship "George J. Goulandris", one in personam by the British Corporation against the owners of the steamship, and a cross-libel by the owners of the steamship against the cargo and the British Corporation as owner of the cargo, were heard together and involve one question, viz:—the right of the vessel to refuse to continue a chartered voyage from New York, by way of Portland and Providence, to the United Kingdom with a load of scrap

iron, after the breaking out of the war between England and Germany.

The facts are largely undisputed. The "Goulandris", a steamship owned by Goulandris Brothers, Greek citizens, and wholly manned by Greeks, was chartered on July 31, 1939, by the British Iron & Steel Corporation, Ltd., of London, England, to carry 6,500 tons of scrap iron from one or two safe ports between New York and Portland, both inclusive, "to one safe port in the United Kingdom, discharging range to be declared 8 days after sailing and port of discharge to be declared when vessel is 72 hours off Lands End * * * or as near thereto as she may safely get".

The vessel arrived in Portland, her first loading port, on Saturday, September 2, 1939. On the next day, Sunday, September 3, England and France declared war on Germany. The Monday following was a holiday. On Tuesday, September 5, the local agent of the charterers, Mr. Gignoux, interviewed the master of the vessel to find out his attitude about the voyage, in view of the news of war. The master testified on this point as follows:

"Q. Will you state what conversations you had with Mr. Gignoux on September 5th regarding loading. A. Mr. Gignoux asked me if the war made any difference to me.

"Q. What response, if any, did you make to Mr. Gignoux? A. I answered that it isn't easy for me to stop those gentlemen from loading, but I will refuse to to sign bill of lading for U. K. So they did not start that day.

"Q. Did you say at that time why you would not sign the bill of lading? A. Because I was afraid.

"Q. Did you tell Mr. Gignoux? A. Yes, I told him I was afraid.

"Q. Afraid of what? A. From the war. I was afraid to lose lives, vessel and cargo too.

"Q. Were you then, Captain, familiar with the terms of the charter party? A. Yes."

Mr. Gignoux was present at the trial and the above testimony as to the conversation with him was not refuted.

The reference by the captain to stopping "those gentlemen from loading" evidently referred to the charterers or their employees whose duty it was to load the vessel.

This conversation between the captain and the agent of the charterers who was also,—until the controversy got a bit warmer,—the local agent of the owners of the vessel, was the beginning of the dispute between the owners of the vessel and the charterers, owners of the cargo, which culminated in these libels.

Nothing else occurred on the 5th. On the 6th at 1 P. M. the charterers began loading the vessel and by the 11th had put aboard 2,244 tons, being all the scrap that was to be taken on at Portland,—the vessel having been directed thence to proceed to Providence to take on the balance of the cargo and proceed to Europe.

After this loading was completed on the 11th the captain was asked by Mr. Gignoux to sign bills of lading, but he refused, giving the reasons as before, that he was "afraid about the war, about the lives, vessel and cargo"; saying also that he regarded it as unsafe to attempt to reach the United Kingdom with a cargo which he thought was contraband, and having in mind information he had received from the newspapers and radio that numerous neutral vessels bound for Great Britain had been sunk by German submarines.

Meanwhile the captain had been in communication with his owners' agents in London, and the owners themselves in Greece. His orders were conflicting. On the 6th the London agents cabled him to load, but on the 10th the owners in Greece cabled him not to load. On the 16th the London agents cabled him not to load further, and on the 30th the owners cabled instructions to discharge the cargo. The captain testified that he had lost faith in the agents in London.

Certain notices in writing were given to make a record of the position of the parties. On September 11, Mr. Gignoux, as agent for the charterers notified the captain of the Goulandris that the British Iron & Steel Corporation, Ltd., would hold him responsible for all delays caused by his refusal to sign bills of lading and his refusal to clear and sail to the second loading point and thence to the destination, as provided in the charter party. On the 30th the captain wrote the New York agents of the British Iron & Steel Corporation, Ltd., as follows: "Confirming the various conversations between your agent, in New York, and Fred E. Gignoux, local agent, I have received instructions from my owners to discharge the cargo of scrap metal now

aboard my ship at the port of Portland, and I am prepared to move my ship to a safe dock in Portland where you may discharge the cargo, but unless I receive your instructions to proceed to a proper berth at Portland for the purpose of discharging the cargo by noon on Tuesday, October 3, 1939, I will proceed to have this cargo discharged and stored, the cost and expense thereof to be borne by you as charterers and as owners of the cargo."

The charterers, adhering to their position that the ship should load and sail, took no action on the letter of the captain and on the 12th the Goulandris started discharging the cargo that she had taken on and the discharging was completed on the 17th. The libels followed.

The owners of the vessel have advanced and argued several reasons for non-performance of their undertakings in the charter party. Among others they allege that they are excused by the general maritime law, by the "Restraint of Princes" clause and the war risk clauses in the charter. These clauses are as follows:

"2. It is also mutually agreed that the carrier shall not be liable for loss or damage occasioned by causes beyond his control, by the perils of the seas or other waters * * * by enemies, pirates, or robbers, by arrest and restraint of Princes, Rulers or People * * * Charterers also not to be responsible for restraints of Princes, Rulers or People."

"War Risks Clauses.

"1. No Bills of Lading to be signed for any blockaded port and if the port of discharge be declared blockaded after Bills of Lading have been signed, or if the port to which the ship has been ordered to discharge either on signing Bills of Lading or thereafter be one to which the ship is or shall be prohibited from going by the Government of the nation under whose flag the ship sails or by any other Government, the owner shall discharge the cargo at any other port covered by this Charter-party as ordered by the Charterers (provided such other port is not a blockaded or prohibited port as above mentioned) and shall be entitled to freight as if the ship had discharged at the port or ports of discharge to which she was originally ordered.

"2. The ship shall have liberty to comply with any orders or directions as to departure, arrival, routes, ports of call, stoppages, destination, delivery or otherwise howsoever given by the Government of the Nation under whose flag the act with authority of such Government or of any department thereof, or by any committee or person having, under the terms of the War Risks Insurance on the ship, the right to give such orders or directions and if by reason of and in compliance with any such orders or directions anything is done or not done, the same shall not be deemed a deviation, and delivery in accordance with such orders or directions shall be a fulfillment of the contract voyage and the freight shall be payable accordingly."

The industry of counsel has brought to my attention numerous decisions of the higher courts in this and other countries involving the rights and responsibilities of ship masters and owners under contracts of carriage when war has broken out after the contract was made,—as in this case. While the facts in the different cases vary considerably, I gather from the authorities that there is one principle which, when applicable, may be depended upon as a guide to the decision of a dispute such as this. It is that when the "Restraint of Princes" clause or similar language is found in the contract a reasonable apprehension of capture or destruction of the ship or cargo will justify non-performance of the agreement to carry.

The leading case of The Styria v. Morgan, 186 U.S. 1–18, 22 S.Ct. 731, 46 L.Ed. 1027, decided that a well-gounded fear of restraint is equivalent to actual force.

Quoting with approval from the opinion in Nobel's Explosives Co. v. Jenkins, L.R. 1896, 2 Q.B. 326, the court said: "'The main ground of defence was the exception in the bill of lading of "restraint of princes, rulers or people". A large body of evidence was laid before me to show that if the vessel sailed with the goods on board she would, in all probability, be stopped and searched. It was certain in that case that the goods would have been confiscated, and quite uncertain what course the captors would take with the ship and the rest of the cargo. I am satisfied that if the master had continued the voyage with the goods on board he would have been acting recklessly. It was argued for the plaintiffs that the cause did not apply unless there was a direct and specific action upon the goods by sovereign authority. It was said that the fear of seizure, however well founded, was not a restraint, and that

something in the nature of a seizure was necessary. But this argument is disposed of by the cases of Geipel v. Smith, L.R. 7 Q.B. 404, and Rodoconachi v. Elliott, L.R. 9 C.P. 518.'"

In the Nobel case the probability that the vessel would be stopped and searched (in which case the goods would certainly be confiscated) was held to justify the captain in his refusal to carry the goods beyond a certain point, under the restraint of princes clause in his bill of lading.

The case of Geipel v. Smith, L.R. 7, 2 Q.B. 404, referred to in the Styria opinion, as stated in the opinion, "was a case where the defendants had agreed to load a cargo of coal in England and sail to Hamburg. After the charter party had been made war broke out between France and Germany and the port of Hamburg was blockaded by the French fleet. The defendants refused to carry out the charter party, relying on the exception of restraints of princes and rulers. It was held that they were justified in their refusal."

In the Styria case the facts were, in brief, that an Austrian ship sailing from Trieste via Sicilian ports to New York took on board at port Empeodocle, Sicily, a quantity of sulphur for New York. Before sailing the master learned that war had broken out between Spain and the United States, and as sulphur was an article considered contraband of war, he unloaded the sulphur and warehoused it at port Empeodocle before sailing. The master feared the seizure of the sulphur by Spanish ships of war before he could clear the Straits of Gibraltar. The court held that the master was justified in his course, not only by the terms of his charter, which contained the restraint of princes clause, but by the duty resting upon him by law to take reasonable care of the goods entrusted to him. It was unimportant, the court said, that another ship with sulphur sailing at about the same time went through unharmed to New York, or that no ships with sulphur were seized. There was another point involved in the case not pertinent here, involving the discretion of the master, and the court held on the whole case that "the master was justified in landing and storing the cargo that had become contraband by reason of the outbreak of the war between Spain and the United States, and by the Spanish proclamation on April 23; that, having acted reasonably with due regard to the interest of all con-

cerned in so doing, it was not made his duty, by the facts brought to his notice, to reship the sulphur on the Styria and further delay his voyage." [186 U.S. 1, 22 S.Ct. 740, 46 L.Ed. 1027.]

■ The Styria was carrying goods regarded as contraband, and the Goulandris, in this case, was carrying, or agreed to carry, merchandise which the Germans promptly announced to be contraband after the declaration of war; but that is important principally as affecting the danger of seizure or destruction, there being nothing inherently unlawful in the carrying of contraband merchandise by a neutral. Balfour, Guthrie & Co. v. Portland & Asiatic S. S. Co., D.C., 167 F. 1010-1017.

In Atlantic Fruit Co. v. Solari et al., D. C., 238 F. 217, 222, Judge Hand commenting on the Styria case, said:

"A cargo of sulphur was loaded at Palermo for New York. The court held that the captain was justified in unloading it on the outbreak of the Spanish War, because it was contraband, and subjected the ship to capture by war vessels off the Spanish coast. The ground upon which the decision was placed was the 'restraint of princes' clause, though the court incidentally remarked that: 'The ship made no contract to carry contraband of war to the port of a belligerent, and should not be held to the obligations of a contract into which she has never entered.'

"This language merely means that the 'restraint of princes' clause furnished an excuse for refusing to carry contraband, because there was no specific provision to carry such cargo, and the danger of seizure and destruction was an effective restraint. In other words, the 'restraint of princes,' and not the contraband goods which occasioned the restraint, was a sufficient excuse for refusing to carry the cargo."

In The Kronprinzessin Cecilie, 244 U.S. 12, 37 S.Ct. 490, 492, 61 L.Ed. 960, a noted case originating in this district, the German liner of that name bound to Plymouth and Cherbourg from New York, on July 31, 1914, on the eve of the last war, turned back in mid Atlantic and returned to this country at Bar Harbor, to avoid anticipated seizure as a prize. Under the circumstances existing her capture was practically certain. Her bill of lading contained the restraint of princes clause, but this did not seem to cut much figure in the opinion written by Mr. Justice Holmes where

it was held, that regardless of the wording in the bill of lading, peril of belligerent capture constituted an implied exception to the carrier's undertaking. The court said: "We agree with the counsel for the libellants that on July 27 neither party to the contract thought that it would not be performed. It was made in the usual form, and, as we gather, charged no unusual or additional sum because of an apprehension of war. It follows, in our opinion, that the document is to be construed in the same way that the same regular printed form would be construed if it had been issued when no apprehensions were felt. It embodied simply an ordinary bailment to a common carrier, subject to the implied exceptions which it would be extravagant to say were excluded because they were not written in. Business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs. The case of The Styria [v. Morgan], supra [186 U.S. 1, 22 S.Ct. 731, 46 L.Ed. 1027], although not strictly in point, tends in the direction of the principles that we adopt."

Apparently the doctrine of exemption from liability under the restraint of princes clause, while at hand and applicable, was not especially relied upon. It was swallowed up by the larger doctrine of frustration or implied exception used by the court.

In the case of M. A. Quina Export Co. v. Seebold, 5 Cir., 287 F. 626, by a charter party entered into during the last war the vessel was chartered to carry a cargo of lumber from a Gulf port in this country to "any safe always afloat port in the United Kingdom". The charter excepted "the act of God, restraints of princes and rulers, the king's enemies * * * or any extraordinary occurrences beyond the control of either party." The court held that the subsequent proclamation of unrestricted submarine warfare by Germany, justified refusal to perform the contract of carriage.

The case of Luckenbach Steamship Co. v. Grace & Co., 4 Cir., 267 F. 676, 679, is cited and relied upon by the charterers here. It was a case where a steamship was chartered in 1916 to carry nitrate from Chili to New York. After we entered the war in 1917, the ship owners declined to carry the nitrate, claiming to be excused under the restraint of princes clause in the charter and alleging that the vessel, carrying contraband of war, was in danger of capture and destruction by German submarines which, as it was rumored or suspected, had been seen on this side of the ocean on the trade routes between North and South America. The court rejected this contention saying that arguments resting on rumor fell far short of stating a case of "restraint of princes". No facts were shown indicating any particular danger to commerce between North and South America.

These cases and others cited by counsel show clearly enough that whether apprehension of attack on a ship in time of war is to be considered reasonable, and therefore a justification for not performing the contract of carriage, must depend on the circumstances of the particular case,—especially upon the degree of danger shown to be present.

On one end of the line of cases is The Kronprinzessin Cecilie, and on the other, the Luckenbach case. In the former the danger was so real that it was regarded as certain that if the ship had proceeded on her voyage as planned, she and her cargo and the 667 German citizens on board would have been in British hands inside of a few hours. In the Luckenbach case, the alleged danger appeared to be based wholly on rumor, and was not shown to have any substance.

This is not a case where the master of a ship, out of communication with the interested parties, must use his reasonable, prudent judgment, acting as agent for both ship and cargo. Here the master was in cable communication with his owners, who evidently approved his attitude, as they directed him to discharge the cargo after the charterers refused to take it out of the ship; and the charterers, owners of the cargo, had their own agents (as well as their own lawyers) on the spot, and were in total disagreement with the captain throughout.

I fail to see that it is material whether the captain used his sole judgment or whether, as the evidence shows, he first used his own judgment in informing the ship's agents he would not sign bills of lading, and was afterwards supported by his owners. It appears that his best informed judgment was against sailing on account of the danger from German submarines around the British Isles, and this was also the judgment of his owners. It

seems, also, that the captain was not alone in his antipathy to submarines, as the entire crew testified that they would not sail on that voyage, even if ordered to do so, and ten of them deserted the ship.

The question is whether those in control of the ship had the right claimed to abandon the voyage.

According to the captain's testimony he kept in close touch with the situation in Europe, especially after war was declared the day following his arrival in Portland. He said he considered it unsafe to carry cargo to the United Kingdom: "Because I thought the cargo was contraband, and many steamers with the same kind of cargo were sent to the bottom by the German submarines". He testified that, at the time his testimony was given by deposition, October 18, 1939, he was aware that ships carrying similar cargoes to the United Kingdom had been and were then being attacked, saying, "I think about thirty neutral steamers have been sent to the bottom". He further said that he saw in a newspaper on the 13th of September that scrap metal was considered by the German Government to be contraband.

The information the captain had, according to his testimony, seems to be quite accurate. Among the exhibits in the case is a publication of the United States Department of Commerce, dated January 5, 1940, giving a list of merchant ships lost as a result of the hostilities up to December 11, 1939, according to the list published by Lloyd's of London. This shows a total of 92 lost during the months of September and October, 1939, of which 32 were neutral ships. This does not include the ships listed as missing, where there was doubt as to whether the loss was by war or by marine peril.

The captain's information about contraband of war was correct. On September 13, 1939, Germany published a list of articles she regarded as contraband, including, by general language, scrap metal, and by proclamation issued a thinly veiled threat,—which had already been put into execution,—to destroy all such that she came across.

 Various sources of information have been submitted to the court to enable it to form a picture of the situation around the British Isles in September and October, 1939. The information the court is supposed to have as to events of common knowledge, has been supplemented by compilations from newspapers, shipping journals, insurance reports, copies of speeches and other public records. Charts have been made available showing the waters around the British Isles and elsewhere, from which the Government of this country saw fit to exclude its own commerce. It is quite impossible to figure the percentage of ships lost, as the number of arrivals is not available. Outside of neutral ships destroyed it is a matter of common knowledge that the total loss of British ships has been terrific. Counsel for the vessel here figure that from the evidence before the court Great Britain lost about one-eighteenth of her whole merchant fleet in approximately the first year of the war, although not all in the vicinity of the British Isles. On the other hand it is pointed out that on January 28th, 1940, Mr. Churchill, in a speech, said that "The chances were then 500 to 1 against any ship being sunk if she obeyed Admiralty instructions and joined a British convoy". Evidence has been presented to show that freight and insurance rates greatly advanced immediately upon the breaking out of the war.

██ It is impossible to determine the percentage of chances in favor of this ship having reached a port, safe or otherwise, in the United Kingdom, if she had sailed in September, 1939, nor do I think it necessary to try to do so. It is not a matter of "nice calculations." The Kronprinzessin Cecilie, supra. It cannot be doubted that there existed danger of destruction to any ship that entered the waters around the British Isles from the moment the Athenia was torpedoed on September 4, 1939, to the present time, due to the well-known ruthless methods of the German government. The danger was not fanciful and based on rumor, but actual, based on facts. That the danger was not only real and present, but substantial, is shown by the events both in the record and in common knowledge.

██ Shipowners and captains, with protective clauses like this in their contracts, are not obliged to gamble with death to themselves or their ships, even if the chances are considerably in their favor.

If a real danger is present, apprehension of it cannot be said to be unreasonable because many vessels voluntarily take the risk and get through.

When the degree of danger gets beyond the category of rumored or fanciful danger and may be properly called actual and substantial, a ship that has protected herself, as this did, by the restraint of princes provision and other more or less similar clauses in the charter party, drawn up in peace time, is not obliged to enter the zone of danger after war is declared.

Various suggestions which I have not discussed have been argued by both sides in this controversy, but I consider that any attempted decision of other points would be merely academic.

It is evident from what I have said that I find from the circumstances stated that the libels against the ship should be dismissed.

As to the libel of the ship against the cargo, I am more in doubt, but on the whole I think that that should be dismissed also. It is true that the captain told the agent of the charterers before any cargo was put aboard that he would not sign bills of lading; but he did not prevent the cargo going in, as he could have by sailing or otherwise, and it seems that for some time the parties were in negotiation as to making the voyage on a different and, presumably, a wartime basis. If the owners of the ship, through the captain with whom they were in touch, permitted the cargo to go aboard for any reasons, as they apparently did, thinking they might derive some benefit therefrom, they cannot complain that they had to take it out when negotiations fell through. I do not see any basis for recovery of freight.

Decrees will be entered accordingly, with costs in each case.