THE WILDWOOD.
AMERICAN FOREIGN S. S. CORPORA-
TION et al. v. AMTORG TRADING
CORPORATION et al.
No. 10070.

Circuit Court of Appeals, Ninth Circuit.
Feb. 23, 1943.

See, also, D.C. 40 F.Supp. 796.

Lord, Day & Lord and George deForest Lord, all of New York City, Hayden, Merritt, Summers & Bucey, of Seattle, Wash., Gerald H. Bucey, of New Orleans, La., and Maurice Finkelstein, of New York City, for appellants.

Bogle, Bogle & Gates, Edward G. Dobrin, and Claude E. Wakefield, all of Seattle, Wash., and Charles Recht, of New York City, for appellees.

Before DENMAN, HANEY, and HEALY, Circuit Judges.

DENMAN, Circuit Judge.

This is an appeal in admiralty from a decree of the district court holding appellant, American Foreign Steamship Corporation, hereinafter called Carrier, liable to appellee, Amtorg Trading Corporation, hereinafter called Shipper, (1) for non-performance of Carrier's agreement to carry from the port of Jersey City, New Jersey, to the port of Petropavlovsk or the port of Vladivostok, Siberia, in Carrier's American Steamer Wildwood, miscellaneous cargo, largely copper bullion, delivered to the Carrier by the Shipper and stowed on the Wildwood by the Shipper, and (2) for damage to cargo while on the Wildwood.

(1) The bills of lading, issued on February 20, 1940, provided for a voyage from Jersey City to Vladivostok. The Wildwood had proceeded on that voyage to a point between Balboa, Panama, and Honolulu, Hawaii, when, on March 18th, the Carrier and Shipper, for an added consideration, made an agreement that the vessel should go to and discharge her cargo at Petropavlovsk or, at the Shipper's option, discharge part of the cargo there and proceed to Vladivostok to discharge the balance. The Shipper exercised its option in a letter to the Carrier of March 27th, stating the Wildwood was to "discharge part of the cargo at Petropavlovsk and will proceed to Vladivostok to discharge the balance." The agreement further provided that "all other items and conditions are in accordance with the original bookings and bills of lading."

The vessel arrived at and sailed from Honolulu. Later, on March 27th, the Carrier learned that the British were asserting for the first time in the northern waters of the Pacific Ocean their right of "contraband control" of war material cargoes in neutral vessels which they suspected ultimately might reach Germany. On March 15th British naval vessels had seized the neutral Russian steamer Mayakovsky, also with a cargo of copper bullion, on a voyage from San Francisco, also to Vladivostok via Petropavlovsk, while that steamer was in the North Pacific some 100 miles off Tsugaru Strait, and taken the vessel to Hong Kong some 1700 miles from Vladivostok.

In such a situation the Carrier is required to consider, for the protection of the Shipper's cargo and of his own vessel, the provisions of the bills of lading for abandoning or deviating from the agreed voyage. Clause 4 of the bill of lading provides,

"In any situation whatsoever or wheresoever occurring * * * which in the judgment of the carrier or master is likely to give rise to capture, seizure, detention, damage, delay or disadvantage to or loss of the ship or any part of her cargo, or to make it unsafe, imprudent, or unlawful for any reason to proceed on or continue the voyage or to enter or discharge the goods at the port of discharge, or to give rise to delay or difficulty in arriving, discharging at or leaving the port of discharge * * *" the master may "proceed or return, directly or indirectly, to or

stop at such other port or place whatsoever as he or the carrier may consider safe or advisable under the circumstances * * *."

■ Carrier and Shipper properly agree that "such a clause must be given a reasonable interpretation, and the discretion conferred may not be exercised in an arbitrary or unreasonable manner, nor without substantial grounds, nor will good faith alone suffice."

On March 28, 1940, the Carrier radioed to the Wildwood's captain to bring the Wildwood to Seattle, Washington, and notified the Shipper of the abandonment of the voyage, as warranted by Clause 4 of the bill of lading. She proceeded to Tacoma, Washington, and there returned the cargo to the Shipper.

The testimony establishes that when the above right to deviate or abandon the voyage was created in the Carrier, Britain, being at war with Germany, though not with the United States or Russia, was exercising on the Atlantic and Mediterranean a war practice of "contraband control" over the vessels of the United States and other neutrals. Many such neutral vessels—over 100 American owned—had been seized in Atlantic and Mediterranean waters on the claim that they carried cargoes owned by Germany, and taken to British ports for final determination of their character. However, no contraband control of any kind had been claimed or exercised anywhere in Pacific Ocean waters, save on January 15, 1940, in the peculiar distinguishing incident, later discussed, of the seizure by the British of the Russian vessel, the Selenga, off Formosa in the South China Sea, on a voyage from Manila to Vladivostok, and her taking to the nearby port of Hong Kong.

Both the Carrier and the Shipper knew when Clause 4 was agreed upon that the New Jersey-Petropavlovsk-Vladivostok voyage was not as free of likelihood of seizure by a belligerent as in peace time. The parties are agreed that Clause 4 empowered the Carrier to abandon that voyage only if it was a reasonable inference from facts chargeable to the Carrier's knowledge when the voyage contract was made and the voyage later abandoned, that the hazard of such seizure had become substantially greater during the voyage than anticipated by the parties at its beginning.

■ This agreement as to the Carrier's discretion to abandon the voyage gives no more power of abandonment than exists in the absence of Clause 4. The right to exercise such discretion to abandon has long been established in American and British decisions.

In The Kronprinzessin Cecilie, 244 U.S. 12, 37 S.Ct. 490, 61 L.Ed. 960, that German vessel had sailed from New York bound to Plymouth, England. Because of grave apprehension of war between England and Germany, she turned back to New York before war was declared. In holding the right to abandon was properly exercised, the court declared, (page 24 of 244 U.S., page 492 of 37 S.Ct., 61 L.Ed. 960), "We are wholly unable to accept the argument that although a shipowner may give up his voyage to avoid capture after war is declared, he never is at liberty to anticipate war. In this case the anticipation was correct, and the master is not to be put in the wrong by nice calculations that if all went well he might have delivered the gold and escaped capture by the margin of a few hours."

■ The reasonableness of the carrier's or master's apprehension of the increased hazard is not determined by subsequent events. In The Styria v. Morgan, 186 U.S. 1, 22 S.Ct. 731, 46 L.Ed. 1027, the Styria's master, with the concurrence of the owner's agent, having just loaded a cargo of sulphur consigned to New York, discharged it at its Sicilian loading port on learning of the war between the United States and Spain and that sulphur was on the Spanish contraband list. The master was charged with knowledge of news reports to the effect that there were negotiations with Spain to permit the free carriage of sulphur. It later turned out that the reports were true and the negotiations successful. Not a single sulphur ship was seized by Spain during the entire war (page 7 of 186 U.S., page 736 of 22 S.Ct., 46 L.Ed. 1027.) Nevertheless, the court held proper the discharge of the sulphur and that the action taken could not be judged in the light of "knowledge gained after the event" or "knowledge of subsequent events" (pages 13, 22 of 186 U.S., pages 736, 739 of 22 S.Ct., 46 L.Ed. 1027), but that the court must put itself in the position of the actors in the transaction. So tested, the master's conduct was held to be "a reasonable exercise of judgment." What those concerned have a right to demand is "not an infallible, but a deliberate and consider-

ate, judgment," (pages 9, 10 of 186 U.S., page 734 of 22 S.Ct., 46 L.Ed. 1027).

■ Similarly in Nobel's Explosives Co. v. Jenkins, (1896) 2 Q.B. 326, 8 Aspinwall (N.S.) 818, the abandonment of the voyage was justified because the captain had a "reasonable and well founded belief" of a danger of capture. The carrier's right is excellently expressed in the recent case of The George J. Goulandris, D.C.Me.1941, 36 F. Supp. 827, 834, where a "reasonable apprehension" of seizure is described as arising when "the degree of danger gets beyond the category of rumored or fanciful danger and may be properly called actual and substantial."

In all of the following cases the abandonment of the voyage or turning back of the vessel, because of the increase of hazard over that existing at the time the agreement to carry was made, was held justified. Atlantic Fruit Co. v. Solari, D.C.S.D. N.Y.1916, 238 F. 217, 224; M. A. Quina Export Co. v. Seebold, 5 Cir., 1923, 287 F. 626; Israel v. Luckenbach S. S. Co., 2 Cir., 1925, 6 F.2d 996, 997, 998, 999, 1000; Compagnie de Trefileries v. F. & C. S. S. Co., Ltd., 1920, 192 App.Div. 709, 183 N.Y.S. 169, affirmed 233 N.Y. 596, 135 N.E. 932. Cf. Allanwilde Tr. Corp. v. Vacuum Oil Co., 248 U.S. 377, 39 S.Ct. 147, 63 L.Ed. 312, 3 A.L.R. 15.

The district court found that the British seizure of the Russian ship Mayakovsky, the first in North Pacific waters, disclosed to the Carrier no reasonable apprehension of increased hazard over that contemplated on March 18th, when the agreement was made relative to proceeding to Vladivostok via Petropavlovsk and discharging part of the cargo at the latter port. It found that the abandonment of the voyage was not warranted by the news of the seizure of the Mayakovsky.

■ While an admiralty appeal receives a trial de novo, we accord respect to the findings of the district court. The Ernest H. Meyer, 9 Cir., 84 F.2d 496, 500.

Here we are unable to accept that court's finding of no increase in hazard disclosed by the Mayakovsky's seizure. This is because this finding is in large part based upon another finding of a major probative fact, in determining the extent of the hazard contemplated by the Carrier and Shipper on March 18th, which latter finding has no support whatsoever in the evidence.

In four places, two in his opinion and two in his findings of fact, the venerable district judge assumed as proved that the hazard the parties agreed upon on March 18th, when the contract for the Petropavlovsk-Vladivostok voyage was made, was that the British interference with the trade in Russian goods shipped to Vladivostok then amounted to a "blockade." In these four places the judge finds that during the discussions leading to the Petropavlovsk amendment to the contract of March 18th, the Shipper's agent, a Mr. Vassiliev, told the Carrier's representative that it was safer to go to Petropavlovsk "because of the blockade" of Vladivostok.

However, the district court mistook a later conversation concerning a blockade of Vladivostok, occurring on March 28th, after the Carrier learned on the day before of the seizure of the Mayakovsky, as having occurred ten days earlier, on March 18th, when the Petropavlovsk agreement was made. On March 28th, in urging the Carrier *to resume* the Wildwood's abandoned voyage to Petropavlovsk, Shipper's Mr. Vassiliev said to the Carrier's officers, "It is more safe to go further north than to go to Vladivostok on account of the blockade."

■ There is no evidence that the parties contemplated an existing blockade of that port at any time prior to the abandonment of the voyage. An error so grave is such a patent factor in the district court's decision, that we cannot say that the decision would have been for the Shipper if the court had realized that there was no evidence that the Carrier had agreed to carry to a blockaded port.

In considering de novo the question whether the news of the Mayakovsky warranted the inference of an increased hazard over that contemplated by the Carrier on March 18th, before it was known to it, we thus have the Shipper's own estimate that, when the voyage *was* abandoned, the port of Vladivostok was blockaded. As stated, we cannot find that prior to the Mayakovsky's seizure there was evidence that the hazard in the voyage to Vladivostok amounted to running a blockade or anything approaching it.

Assuming that the word "blockade" is at all applicable to the port of Vladivostok, the action of the British in seizing the Selenga off Formosa in the channel approaching Vladivostok, some 1700 miles distant to the south of that port, is at most but a partial blockade. It is such a partial blockade which is the risk assumed by the Car-

rier. It seems clear that it is more than doubling the hazard of that partial blockade to have the hovering of British naval vessels 1800 miles northerly from Formosa, on the great sailing circle from the United States leading from the northeast to Tsugaru Strait, the normal channel or approach to Vladivostok from the northeast, and but 500 miles distant from that port. It is such an increase of hazard as would require the Carrier to exercise the powers given it under Clause 4 and give it the right to turn the Wildwood away from this newly threatened danger. It is obvious that if a carrier risked a hazard greater than that anticipated by a shipper, and the shipper's cargo was seized, the carrier would be liable to the shipper for its loss,—here of a cargo worth $5,000,000, greatly exceeding the value of the Carrier's 2400-ton steamer.

However that may be, the published facts concerning the single incident of seizure of the Selenga chargeable to the knowledge of the carrier and the shipper, disclose no general British policy of the seizure of all neutral vessels carrying war used metals either to Japan or to Asiatic Russia,—both countries then known to be friendly to Germany. These facts are stated in the Shipper's Exhibit 71, containing articles published in the New York Times on January 14th and January 23, 1940.

The headline of the Times' article of January 14th discloses that the ground of the Selenga's seizure was not a claim to seize all military metal cargoes destined to Siberia. On the contrary the incident is confined to a prohibition of the *reimport* of goods claimed to be German, *taken out before the war began.* The headline reads, "Honk Kong Puts Ban on Nazi Shipments. Re-import of Goods Taken Out Before War Prohibited." (Emphasis supplied.)

The article of January 23rd is a Shanghai dispatch of January 22nd, explaining in detail the facts constituting the grounds of the Selenga's seizure. They are that several years prior to the war, the Germans had obtained a concession for the major part of China's production of wolfram ore, essential to the manufacture of munitions. After the war had started, German agents had succeeded in shipping out a large quantity of such ore to Manila. In January, 1940, the British censors at Hong Kong intercepted cables between the German consulate at Shanghai and other German sources in China, indicating that an at-tempt was going to be made to ship this German owned war material out of Manila, aboard the Selenga. The ship was accordingly intercepted, after it had left Manila, and taken to Hong Kong. The Russians protested that the wolfram ore aboard belonged to Russia, but the British retained it on the ground that they had proof it was German owned. In the Times' report of March 2, 1940, likewise, the material aboard the Selenga is described as "consigned to Germany."

It is thus apparent that the detention of the Selenga was merely an isolated incident, arising from a special cause, viz., the presence on board of German owned material, derived from a German owned concession, being sought to be shipped surreptitiously under the direction of German agents in the Far East. It did not in any way involve, as did the seizure of the Mayakovsky, a general policy of blockade or seizure of neutral vessels, bound for Russian Pacific ports, for contraband detention, irrespective of the prior or present ownership of the cargo, or of the nature of its consignees, merely because there was war material on board, which was going into Russia, and might, thereafter, as it was feared, be made available to Germany.

The cargo aboard the Wildwood was not, and had not been, German owned, the sole ground of action in the Selenga detention: it was not consigned to Germany; it was not being juggled about by German agents in surreptitious endeavor to escape the British. The Selenga's seizure, in these special circumstances, as related prior to March 27th, afforded no reasonable ground for apprehension on the part of the Carrier that the British "contraband control" which had led to the seizure of great numbers of neutral vessels, over 100 of which were American owned, on the Atlantic and Mediterranean waters, had been extended to the Pacific waters.

To the contrary, a London dispatch of February 24, 1940, published in the New York Times on February 28, 1940, reported a colloquy in the House of Commons with Ronald Cross, British Minister for Economic Warfare, in part, as follows:

"Ronald Cross, British Minister for Economic Warfare, revealed in the House of Commons tonight that Britain is considering establishing contraband control of the Pacific particularly around Vladivostok, Russia, in order to prevent Russian imports from reaching Germany.

"He spoke during a debate on the efficiency of the British blockade, precipitated by charges that Russia was buying in the United States large quantities of tin, rubber, copper and other war materials for transshipment to Germany.

\*　\*.　\*　\*　\*　\*

"To charges that looseness of the British blockade was inflicting grave injury to British interests and making great difficulty for the navy, Cross replied *that there was no control in the Pacific."* (Emphasis supplied.)

This categorical statement by the British Minister in charge that there was no contraband control in the Pacific, and the fact that at most there might or might not be in the future, completely refutes the Shipper's contention that the agreement of March 18th for the discharge of part of the cargo at Vladivostok contemplated attempting to evade seizure by the British cruisers exercising such control over vessels bound to that port.

The fact of seizure of the Mayakovsky was very widely and reasonably taken to indicate that the British Government had decided to institute, or had already instituted, a blockade or strict "contraband control" over Russian Pacific ports. Thus, the report in the March 27th issue of the New York Evening Post declared that,

"Confirmation of the Shanghai report would be most important, *a tacit announcement that the British blockade had been extended to Russian Pacific ports* at the same time that France had demanded the recall of the Russian Ambassador at Paris.

"Britain long has believed that Russia was importing U. S. copper in tremendous quantities for Germany.

"Ronald Cross, minister for economic warfare, told the House of Commons last Thursday that the *government was closely watching Russian purchases of war materials, especially copper, from the U..S."* (Emphasis supplied.)

The London correspondent of the New York Herald Tribune drew a similar conclusion from the known facts.

"London, March 27.—*Extension of the British blockade to the Pacific* to regulate large-scale exports of raw material from the United States to Soviet Russia, some of which the British believe 'trickle' through Germany's back door, was foreshadowed today by the news that British warships had intercepted the Russian merchantman Vladimir Mayakovsky near Japan and brought her to Hong Kong for examination.

"The Mayakovsky, first Soviet freighter in the trans-Pacific trade to be caught by the British, is said to have sailed a month ago from Manzanillo, Mexico, with 5,000 tons of American copper. Calling at San Pedro, Calif., the ship took on 200 tons of molybdenum, a metal used for hardening high-grade steel, and headed across the Pacific for Vladivostok, terminus of the Trans-Siberian Railway." (Emphasis supplied.)

The United Press London correspondent interpreted the news to the same effect, stating,

"London, March 27.—British Russian relations are being subjected to severe strain by *extension of the British blockade to the Pacific,* it was disclosed today.

"Russian Ambassador to London Ivan Maisky has protested vainly for a month against the detention of the Russian steamship Mayakovsky at Hong Kong, it \* \* \* was disclosed.

*"The Mayakovsky was the first ship engaged in direct United States-Russian trade to fall to the Allied blockade."* (Emphasis supplied.)

On the evening of March 27th, the well-known commentator, Elmer Davis, reviewing the news on the radio, declared his opinion that it was a question of "contraband control" of the type which the British had exercised previously in Atlantic waters. The same evening, Lowell Thomas broadcast the news as indicating that the British blockade had finally reached to the Pacific, and that the "British theory in seizing the vessel was that she was carrying copper and other materials which eventually would find their way into Germany."

The Associated Press news broadcast, also on the night of March 27th, informed its hearers of the constant surveillance of the ship *by the British during its tortuous course from one Pacific port to another,* and, speaking of another Russian ship recently loaded with copper off the West Coast, asked, the "question now is, will she escape the British Blockade?"

These reports and comments, all of which were read or heard by one or more of Carrier's officials, furnished abundant grounds for acute fear that the Wildwood, heavily loaded with a similar cargo and bound for a similar port, was in a perilous position. They were not mere fanciful and

unfounded rumors, but the natural and world-wide interpretation of admitted facts by persons who were' experts on foreign affairs. It would have been foolhardy for the Carrier to set up its judgment in opposition to facts stated by the press and the most experienced radio and news commentators of the day who appear to have been convinced that the seizure of the Mayakovsky meant "blockade" or strict contraband control of Russian Siberian ports. Whether the threatened seizures were to be made in pursuit of a technical "blockade" or of a strict "contraband control," or whether there was what the district court called, without definition, a "war zone," was wholly immaterial, in any case, the danger of seizure and indefinitely prolonged detention was the same.

Carrier made proper efforts to obtain whatever further official information might be available. Through its Washington attorneys, it approached the Russian Embassy, the British Embassy, and the United States Department of State, but could obtain no denial. At the Russian Embassy no contact could be made with the Ambassador, and inquiries were referred by a subordinate to Amtorg. The British Embassy would make no statement whatever. The United States Department of State declared that it was unable to give any information that would cast doubt upon the accuracy of the published accounts.

Under these circumstances, no conclusion could reasonably be reached by Carrier, or any other persons similarly placed, save that the further progress of the Wildwood, with its cargo of metals, similar to those on the seized vessel, towards its ports of destination, was fraught with serious risk. No formal declaration of war is necessary to justify a ship in refusing to sail into a zone of danger (Kawasaki Kisen Kabushiki Kaisha of Kobe v. Bantham S. S. Co. (1939) 2 K. B. 544); nor is a formal declaration of blockade, or of "contraband control"; nor any explicit official announcement that goods being carried to ports hitherto undisturbed, would subsequently be seized. What counts is not the formality of the declaration, but the reality, or apparent reality, of the danger. Nor is it relevant that the British concluded not further to harass the Russians and that there were no further seizures in the Pacific.

■ We hold that, based upon its knowledge on March 27, 1940, that the British had seized the neutral Mayakovsky, on a similar voyage, the Carrier had a reasonable apprehension of a real danger of the seizure of the Wildwood by the British naval vessels on her voyage to Vladivostok via Petropavlovsk; that the danger so reasonably apprehended was a far greater war hazard than that contemplated by the parties when the charter was made for the voyage to Vladivostok, the bills of lading issued on February 20th, and on March 18th when the agreement was altered to discharge part of the cargo at Petropavlovsk; and that on March 28th, the Carrier was entitled under Clause 4 of the bill of lading, as well as under the general maritime law, to abandon the voyage and return to Tacoma, Washington.

■ (2) The Shipper filed a supplemental libel for damage to cargo in the No. 1 between decks and lower hold. The damage was both by fresh and salt water. The cargo was loaded by the Shipper in rainy weather, which caused the fresh water damage of which the Shipper cannot complain. ₒ

As to the salt water damage, the Carrier relies on Section 4(2), subdivision (c) of the Carriage of Goods by Sea Act of 1936, 46 U.S.C.A. § 1304(2) (c), by which a carrier is exempted from liability if he prove the cargo damage was caused by a peril of the sea. The Carrier proved a storm of several days, with very heavy weather, in which the seas crossed the decks and damaged the No. 1 hold hatch coverings so that it was possible for the salt water to enter. There was other damage to the vessel, the heavy seas aboard smashing the door to the saloon alley and breaking off the guard plates for the steam pipes on the side of the No. 3 hatches.

The district court made no finding on the issue tendered by the Carrier that the damage was caused by a peril of the sea. Instead, he found that "The salt water which came in contact with the cargo in No. 1 hold came from the chain locker which is immediately forward of No. 1 hold. * * * Water entered the chain locker through the chain pipes which open onto the deck. These chain pipes are usually covered or filled with a cement plug to keep out the water. The function of the chain pipe cover or plug is likely to be impaired by the straining of the vessel in a rough sea."

■ The evidence is contrary to this finding. In the ship carpenter's deposition

is his uncontradicted testimony that the chain pipes were cemented up by him at each port and found intact on arrival at each succeeding port. The Shipper must be regarded as having accepted this statement as true, for its proctor not only did not cross-examine the carpenter on this testimony, but also failed to introduce any evidence to the contrary concerning the actual condition of the cement plugs on arrival at the various ports of the voyage. It was proved that the ship's plates had not been strained. Since the only possible entrances of the sea water into the chain lock were sealed up, the water in the No. 1 hold could not have come from that source.

We find that the sea water damage to the cargo was due to the heavy storm, a peril of the sea, which caused an opening in the hatches through which the water entered.

The interlocutory decree is set aside and we decree that the Carrier is not liable to the Shipper by reason of the deviation from the voyage to Vladivostok via Petropavlovsk, or because of any damage to the Shipper's cargo while in the possession of the Carrier, and that the libel and supplemental libel be dismissed.

Reversed, with decree for appellants.